PALMER COAL & ROCK COMPANY,
a corporation, Plaintiff-Appellee,

v.

GULF OIL COMPANY—U. S., a corpo-
ration, aka Gulf Oil Corporation, a
corporation, and the Pittsburg & Mid-
way Coal Mining Co., a corporation,
Defendants-Appellants.

No. 74–1599.

United States Court of Appeals,
Tenth Circuit.

Argued May 19, 1975.

Decided Nov. 3, 1975.

Rehearing Denied Dec. 19, 1975.

Leonard O. Thomas, Weeks, Thomas, Lysaught, Bingham & Mustain, Kansas City, Kan. (David K. Fromme, Kansas City, Kan., on the brief), for defendants-appellants.

John E. Shamberg, Schnider, Shamberg & May, Shawnee Mission, Kan. (Charles S. Schnider, Shawnee Mission, Kan., on the brief), Forrest E. Short, Short & Short, Fort Scott, Kan. (Joel B. Short, Fort Scott, Kan., on the brief), for plaintiff-appellee.

Before LEWIS, Chief Judge, and McWILLIAMS and DOYLE, Circuit Judges.

LEWIS, Chief Judge.

Defendant Gulf Oil Company (Gulf) and its subsidiary, Pittsburg & Midway

Coal Mining Company (P & M), appeal from judgments entered in the district court for the District of Kansas following jury verdicts amounting to $500,000 compensatory and $1,500,000 punitive damages awarded to plaintiff Palmer Coal & Rock Company (Palmer Coal). The trial court reduced the actual damages to $466,830.50 after determining that the jury verdict was supported by the evidence only to that extent. The verdicts resulted from the jury's favorable consideration of plaintiff's claims of damage resulting from flagrant and fraudulent misrepresentations made by defendants during the course of acquisition of coal properties in Kansas and Missouri.

■ The trial court submitted the issues to the jury under instructions specifically setting out the elements allowing recovery for actionable fraud under Kansas law and to which no objections were taken. Although defendants' claims of trial error are separately stated and argued they are largely directed at the sufficiency of the evidence to support any recovery under the court's instructions.[1] Since our review of the record we are fully satisfied, as was the trial court, that the evidence is completely adequate to support recovery. The testimony is, of course, extensive, conflicting in part, and, in some instances, somewhat contradictory. However, viewing the evidence from a credibility standpoint favorable to the verdict, the agreements, actions, and motives of the parties can be summarized and narrated.

During the mid-1960's Palmer Coal was organized and began operating a relatively small leasehold custom coal mining operation in Kansas. The operation proved moderately successful and sufficiently so to allow Palmer Coal to borrow a total of $225,000 from the Small Business Administration for expansion purposes, the loan being arranged through a Kansas bank.

The expanded Palmer mine was still prospering in 1968 when its owners became alarmed by information that Gulf interests were doing extensive drilling in large areas of Kansas and Missouri and upon land near and even adjacent to the Palmer leasehold. Recognizing that Gulf's activities and intentions were critical to the long term Palmer interests, particularly because long term operations required the acquisition of additional coal resources for Palmer, Mr. Harold Card, a vice president of Palmer, called Mr. James Miner, vice president of P & M in charge of land acquisition, and arranged a meeting.

At this meeting Miner assured Card that the Gulf interests had no plans or intentions of harming the Palmer operations and to the contrary that the two companies could and should cooperate to their mutual benefit. Card testified as to Miner's representations in detail:

> He [Miner] told me that we could be of great help to them in the area by being familiar with it, No. 1, knowing the people that were involved around the area, we were acquainted with them, most of the people in this small

---

1. 1. That false or untrue representations were made as a statement of existing and material fact;

2. That the representations were known to be false or untrue by the party making them, or were recklessly made without knowledge of their truth or falsity;

3. That the representations were made with the intent to deceive and for the purpose of inducing the plaintiff to act upon them;

4. That plaintiff relied and acted upon the representations made; and

5. That plaintiff sustained damage as a result of relying upon the representations.

You are instructed that a representation is material when it relates to some matter that is so substantial and important as to influence the party to whom it is made.

Misrepresentations in order to constitute actionable fraud, must relate to a material present or pre-existing fact. Ordinarily, fraud cannot be predicated on unfulfilled promises or statements concerning future events. However, a promise to do something in the future, when the other elements of fraud are present, constitutes actionable fraud if at the time of making the statement the promissor has no intention of performing the promise made.

area, that we could be an asset to Gulf in acquiring these reserves and *if we would cooperate, he would set aside or carve out whatever coal was needed by us if we wanted to continue and stay in the coal business.*

At that time I told him I thought we would like to stay in the coal business and by him protecting us on future reserves, I thought it would be a great deal.

He said if we weren't quite satisfied with the situation, *could even be that they would just take us out of business or buy us out of business, if this was our desire, provided that they took the field, if they bought the field. So I told him it sounded like a good agreement* but I would appreciate it if he would go over to my banker with me. I said, "This being a small area, the rumor gets out about Gulf, it will scare the banker and we owe him the money. Would you go over and tell him what you just told me?" He said, "Harold, I would even put it in writing but I would rather not. It would constitute more problems and I just would not rather." I said, "I have no reason not to trust you, sir, but if you will go to the bank with me so my banker won't become upset, that's fine." So we finished our coffee, went directly to the bank from there.

(Emphasis added.)

The testimony of the banker, Floyd Dotson, completely corroborated Card's version of Miner's representations. Dotson testified that Miner represented

his company would be willing to bail them [Palmer] out by purchasing their property or carve them out this land that would give them 8 to 10 years of operation in that area.

Subsequently, the owners of Palmer Coal made substantial efforts to help P & M obtain acreage. Card toured and discussed the area with Miner and other officers of defendants. Local landowners were encouraged to talk to defendants' representatives and were visited by Card with defendants' land agents.

Lists of landowners were also furnished. Card talked to local banks, the radio station manager, merchants, and others. Equipment was stored at the Palmer mine and P & M's employees made use of those facilities. Card also accompanied and assisted in P & M's drillings. Defendants were allowed to study plaintiff's mine and its coal vein was measured and correlated with the lay of the land. Knowledge and information concerning coal-bearing lands, developed in part from some 300 core-drilling tests, was also conveyed. Prior to enlisting the help of the Palmer mine owners defendants had obtained but four options to purchase land; in the subsequent four months 60 option agreements with property owners were reached covering 13,-650 acres of coal-bearing land in the vicinity of the Palmer mine.

During this period output at the Palmer mine slowed because of Card's frequent absence on behalf of defendants and as a result of employees obtaining other employment because of a fear that P & M would shut down the Palmer mine. Palmer Coal failed to make a July payment and following payments on its S.B.A. insured loan from Dotson's bank. In December as the S.B.A. began pressing plaintiff to pay the loan it was told of the alleged agreement between plaintiff and defendants and a meeting was arranged. In attendance were Palmer, Card, Dotson, Miner and P & M's attorney, Borders, together with officers of the S.B.A. Card testified that he asked Jim Miner to "live up to your part of the agreement." Miner responded, "Well, gosh, we couldn't buy you out anyway, we would be violating the antitrust or the antitrust regulation." Borders silenced Miner but at some later point Miner stated that P & M had a "moral obligation" to which Card replied:

This is not what you told me at the bank, this is not what you have been telling me for the past five months. What in the hell do you consider a moral obligation. . . .

Miner responded saying he wasn't aware that they wanted to sell out. Card then said, "Well, I am telling you now, I do." Miner then asked the price to which Card replied:

Jim, I will take a two years possibly three years of hard work, throw it down the drain, you just give us a check here for three hundred and seventy-five thousand dollars. I can pay S.B.A. off, I will take my bath and get the hell out of here.

Borders then terminated that dialogue and an agreement was reached to submit the financial reports of Palmer Coal to P & M to enable them to consider the purchase. After the reports were submitted P & M refused any purchase.

The lessors of the land on which the Palmer mine operated testified that during the same months that Palmer Coal was actively assisting defendants, those same defendants attempted to purchase the leasehold right out from under the Palmer mine.

After P & M's refusal to recognize any obligation to Palmer Coal this company's mortgage was foreclosed and its entire investment was lost.

As we have earlier indicated, we conclude that plaintiff made a case and, indeed, a strong case. Falsity, inducement, reliance and damage are manifest and the jury could well infer that P & M at no time intended to keep its promises. Miner's avoidance of any writing and the somewhat suppressed concern of P & M relating to possible antitrust difficulties of a buy-out were present at all times during the critical period and could premise such an inference.

■■■ Defendants further seek reversal of the case on two issues pertaining to damages. First, the contention is made that the trial court, having determined that the jury award of $500,000 was not supported by the evidence, was powerless to do anything but grant a new trial. We find no support for this argument when the reduction, as here, was made with the consent of the plaintiff, without objection by the defendants,

and was made by computations supported by the evidence. Second, defendants assert that the punitive damage award, through amount alone, shows a premise of bias and prejudice. The trial court indicated it was not shocked by the amount nor is this court. Palmer Coal was treated very shabbily by the Gulf interests (assets well over nine billion dollars) and the purpose of punitive damages is to make such conduct unprofitable at least.

■■■ Finally, we hold that the trial court made no prejudicial error in the admission of evidence. Defendants objected to the admission of three questions contained in a deposition of Mr. Miner claiming that the questions corrupted the context of Miner's deposition testimony and also that plaintiff had not shown the unavailability of the witness. In regard to the latter objection the court inquired:

Mr. Willson: For the record, Your Honor, I object to the admission of only three questions out of a deposition that contained—appears here over six or seven hundred—at least six hundred fifty-four questions, as being taken out of context. There has been no showing that Mr. Miner was not available to them to come into court and testify, no effort has been made to have him come in and testify to this. There is no proper foundation.

The Court: You don't have to show unavailability on an official of a corporation.

Mr. Willson: He is not an official of a corporation, Your Honor, he is retired.

The Court: Are you disputing he is a vice-president or was at the time?

Mr. Willson: He was at the time. He is no longer with the company.

The Court: Your objection is overruled and you may read them.

Apparently Miner was not, in fact, a corporate officer at the time the deposition was *taken* but the trial court had a right to assume that counsel's answer was given in response to the requirements of

Fed.R.Civ.P. 32(a)(2) and that the answer referred to that time. The error, in any event, was caused by counsel's lack of specificity. Nor can note be taken at this time of a claim that the deposition was used out of context when, as here, no offer of other portions of the deposition was made by defendants and it is inherently doubtful that any such matter could be considered as prejudicial when, as here, the witness testified, personally, at length later in the trial.

Defendants also assert that the court erred in allowing evidence to be received as to a subsequent sale of property which included some assets of Palmer Coal. Although the relevancy of this evidence is perhaps questionable its impact could not be prejudicial as against the record as a whole.

The judgment is affirmed.