BRINK'S INC., Plaintiff and Defendant on Counterclaim,

v.

The CITY OF NEW YORK, Defendant and Counterclaimant.

BRINK'S INC., Third-Party Plaintiff,

v.

John ADAMS, Anthony De Nardo, Trevor Fairweather, Richard Florio, James Gargiulo, Jorge Olivari and Michael Solomon, William J. Donovan, Francis Gitto, Ramon Hernandez, William McInerney, Anthony San Marco, Jose Rodriguez, James Springett, John Barrera and Joseph Nardo, Third-Party Defendants.

No. 80 Civ. 6975.

United States District Court, S. D. New York.

Aug. 30, 1982.

Milgrim, Thomajan, Jacobs & Lee, New York City, for Brink's Inc.; Andrew L. Deutsch, Robert A. Meister, New York City, of counsel.

Frederick A.O. Schwarz, Jr., Corp. Counsel, New York City, for City of New York; Jeffrey E. Glen, Edward Tuozzo, Patricia Kruger, New York City, of counsel.

Cravath, Swaine & Moore, New York City, for third-party defendant James Gargiulo; H. Michael Clyde, Harold E. Akselrad, New York City, of counsel.

Philip M. Kovitz, New York City, for third-party defendant Jose Rodriguez.

## OPINION

EDWARD WEINFELD, District Judge.

Brink's Inc. ("Brink's") and The City of New York (the "City") were parties to an agreement under which Brink's was to collect coins deposited in the City's parking meters. After the contract had been in effect about two years and following the arrest of a number of employees who were charged with stealing collection proceeds, the City cancelled the contract and sought to hold Brink's liable for losses sustained during the performance of the contract. The City sought recovery upon two separate theories: (1) breach of contract for negligent failure to deliver the meter collections to the City; and (2) common law negligence. In addition to compensatory damages, the City also sought punitive damages. Brink's denied liability but, in the event that it was held liable to the City, asserted a cross-claim for indemnity against fifteen present and former employees. The Court submitted a special verdict to the jury which found that the City had sustained its claims for breach of contract and negligence based upon Brink's' failure to (1) supervise and (2) investigate various matters with respect to its employees' larcenous activities. The jury also found that Brink's had failed to sustain its claim that the City was also at fault and had contributed to the damages sustained. The jury awarded the City $1,000,000 compensatory damages and $5,000,000 punitive damages. It also awarded Brink's on its cross-claims $5,000 as against ten employees and found in favor of five other employees who were named as third-party defendants.

1. *O'Connor v. Pennsylvania R.R. Co.,* 308 F.2d 911, 914 (2d Cir. 1962).

2. *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 696, 82 S.Ct. 1404,

Brink's now moves pursuant to: (1) Rule 50(a) of the Federal Rules of Civil Procedure for a directed verdict on the compensatory and punitive damage claims as to which the Court reserved decision during the trial; (2) Rule 50(b) for judgment notwithstanding the verdict (n.o.v.) as to both damage awards; and alternatively, (3) Rule 59 for a new trial on the ground that the awards are grossly excessive. Brink's further moves to set aside the verdicts in its favor on its indemnity claims against its employees on the ground that they are grossly inadequate, inconsistent and are the result of passion and prejudice and in disregard of the Court's instructions. Alternatively, Brink's requests that the judgments against the ten individual employees be entered jointly, that is in the sum of $50,000 instead of $5,000 against each individual employee, since the jury found that each had acted "jointly and in concert with other employees, whether known or unknown," which the third-party defendants oppose on the ground the evidence does not support a finding of joint liability.

Each third-party defendant renews his respective motion for a directed verdict made at the close of the trial as to which the Court reserved decision and also moves for judgment n.o.v. pursuant to Rule 50(a) and (b).

The test on a motion for a directed verdict made at the close of the party's case and at the close of all the evidence upon which the Court reserved decision is essentially the same as that applied on a motion for judgment n.o.v.[1] Under familiar concepts, the Court may not substitute its judgment for that of the jury but is bound to view the evidence in the light most favorable to the prevailing party and to give it the benefit of all inferences which the evidence fairly supports, even though contrary inferences might be reasonably drawn.[2] A trial court may correct a jury's decision only if after so viewing the evi-

1409, 8 L.Ed.2d 777 (1962); *Michelman v. Clark-Schwebel Fiber Glass Corp.,* 534 F.2d 1036, 1042 (2d Cir.), *cert. denied,* 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976).

dence it is convinced that (1) there is a complete absence of probative evidence to support the verdict in favor of the prevailing party, or (2) that the evidence is so strong and overwhelmingly in favor of the nonprevailing party that reasonable and fair-minded persons in the exercise of impartial judgment could not render a verdict against it.[3]

The City's evidence in support of its claims against Brink's necessarily supplied the proof to sustain Brink's' indemnity claim against its errant employees since the basic element in the City's case was the systematic theft of meter coin deposits by Brink's' employees, whether named or unknown.

First, we consider the evidence offered by the City to support the basic element of all its claims that Brink's' employees engaged over an extended period in concerted action in the pilferage of meter coin deposits. As has so often been stated, a conspiracy or concerted action by those engaged in unlawful conduct is rarely capable of direct proof but usually is established by inferences that may fairly be drawn from the behavior of the alleged participants.[4] The acts and conduct relied upon to sustain a conspiracy charge must be viewed not in isolation but in proper perspective as of the time of occurrence, in relationship to one another, and against the totality of relevant evidence.[5] The evidence offered by the City included surveillances of suspected employees who were observed to have deviated from their assigned routes carrying heavy bags from the transport vehicles into an apartment house where one of the employees resided; the results of a salting test[6] which showed substantial unaccounted for coins at various dates and involving different teams of collectors; videotaped surveillances of occasions prior to and on April 9, 1980, when a number of employees were arrested, which showed them acting in what appeared to be a concerted, clandestine and secretive manner with respect to heavy bags allegedly containing meter collection proceeds; the arrest on April 9, 1980 of the group of employees who had in their possession almost $5,000 in coins; and the conviction of a number of the arrested employees either upon pleas of guilty or by a jury verdict for stealing meter coin deposits. In addition, the jury heard various Brink's' employees, who had been subpoenaed by the City, invoke their Fifth Amendment rights to refuse to answer questions regarding the pilferage of coin boxes either by the witness himself or by other employees.

The foregoing, considered with other evidence, was such that it fully justified the jury's verdict on the prime issue of systematic stealing by employees acting in concert to achieve that objective. To argue, as Brink's does (and as do the third-party de-

---

**3.** *Unijax, Inc. v. Champion International, Inc.,* 683 F.2d 678 at 680 n. 6 (2d Cir. 1982); *Armstrong v. Commerce Tankers Corp.,* 423 F.2d 957, 959 (2d Cir.), *cert. denied,* 400 U.S. 833, 91 S.Ct. 67, 27 L.Ed.2d 65 (1970). *See also Gehrhardt v. General Motors Corp.,* 581 F.2d 7, 14 (2d Cir. 1978); *Noonan v. Midland Capital Corp.,* 453 F.2d 459, 461 (2d Cir.), *cert. denied,* 406 U.S. 945, 92 S.Ct. 2044, 32 L.Ed.2d 333 (1972).

**4.** *American Tobacco Co. v. United States,* 328 U.S. 781, 809, 66 S.Ct. 1125, 1138, 90 L.Ed. 1575 (1946); *Eastern States Retail Lumber Dealers Ass'n v. United States,* 234 U.S. 600, 612, 34 S.Ct. 951, 954, 58 L.Ed. 1490 (1914); *United States v. Kahaner,* 203 F.Supp. 78, 84 (S.D.N.Y. 1962).

**5.** *United States v. Stanchich,* 550 F.2d 1294, 1300 (2d Cir. 1977); *United States v. Geaney,* 417 F.2d 1116, 1121 (2d Cir. 1969), *cert. denied,*

397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970); *Hunt v. Mobil Oil Corp.,* 465 F.Supp. 195, 223 (S.D.N.Y. 1978), *aff'd,* 610 F.2d 806 (2d Cir. 1979).

**6.** "Salting" is a process by which coins treated with a fluorescent substance are inserted into meters. The meter identification number and the amount of treated coins inserted is then recorded. The collections by Brink's' personnel from these meters were segregated and scanned under ultraviolet light. The coins which were chemically treated are thus recovered and the amount recovered is compared to the amount originally inserted. The results of these salting operations indicated that substantial percentages of coins deposited in meters and collected by Brink's' personnel were not returned.

fendants) that there was a complete absence of evidence to support the verdict on this issue or that the evidence was so strongly in favor of Brink's and the employees that reasonable and fair-minded men in the exercise of impartial judgment could not have reached the same verdict is to ignore the force of the totality of evidence and to adopt an ostrich-like pose. It follows that the motion of the third-party defendants must be denied. However, proof of the systematic stealing was but one element of the City's negligence and breach of contract claims against Brink's. The City had the burden of proof to establish additional elements of negligence, proximate cause and damages.

■ We next consider the evidence offered by the City to sustain the essential elements of the breach of contract and negligence claims which were factually interrelated and in large measure satisfied by the same proof.[7] In view of the separate specific findings by the jury that Brink's was negligent both in lack of supervision and lack of investigation,[8] it is sufficient if the evidence reasonably supports either ground.[9] Not only does the record furnish a reasonable basis for each finding but, here, too, for Brink's to urge that the record is "utterly devoid"[10] of substantial evidence to sustain the verdict is to cast a blind eye on the record. A cursory reference to some but not all pertinent evidence requires rejection of this contention.

The collections were to be made by the employees of Brink's from more than 60,000 parking meters located along the curbs of many streets and, in some instances, in metered parking lots throughout the five boroughs of the City. The daily collections totalled thousands upon thousands of dollars in coins. The City maintained its own personnel at 42 Franklin Street, Manhattan ("Franklin Street"), where daily collections were turned in by the employees of Brink's to City personnel who then sorted and counted the coins. Under the contract, Brink's was required to provide on a daily basis ten three-man collection teams and vehicles to effect the collections from the parking meters. The teams "shaped up" each morning at Franklin Street and were then assigned to particular collection areas. The contract provided that "[c]ollection crews shall be rotated in the [City's] discretion ... as a security measure." This was intended to prevent the same individuals working with each other on a regular basis; its obvious purpose was to minimize the opportunity for collusive conduct by employees with respect to collections. The designated system was, as the parties referred to it, a "lottery." The contract also required that Brink's provide two supervisors at Franklin Street who were to dispatch the crews and remain at the premises until the crews returned with the day's collection.

The collection system involves three separate units—the parking meter, a coin box contained within the meter, and a collection cannister. The collector is given a key which affords him access to the sealed coin box or vault within the meter. Upon removal of the coin box with its sealed contents, the collector then inserts it into the cylindrical neck of a collection cannister, which is large enough to collect the coin deposits of an entire area of meters. The cannister is equipped with a key-like apparatus which, once the coin box is engaged and twisted, permits the coin box to open and the coins contained therein to drop into

---

7. Brink's has noted, "Since the jury found for Brink's on the City's claim of negligent hiring, for purposes of j.n.o.v. analysis, the verdict on the contract claim is functionally equivalent to the verdict on the City's claims for negligent supervision and investigation of allegations of thefts. Indeed, the Court recognized that to sustain the contract claim the City would have to prove 'the same type of negligence that [it] is advancing under [its] separate negligence claims'" (Tr. at 2822). Memorandum in Support of Brink's' Motion for Directed Verdict at 5 n*.

8. The jury's verdict was in favor of Brink's on the issue of negligence in hiring.

9. *Jaffke v. Dunham,* 352 U.S. 280, 281, 77 S.Ct. 307, 308, 1 L.Ed.2d 314 (1957).

10. *Parcinski v. The Outlet Company,* 673 F.2d 34, 37 (2d Cir. 1982).

the sealed cannister, returning an emptied coin box to the meter. The purpose is to preclude direct access to the coins by the collector. Upon completion of their assigned routes, the men were required to return directly to the Franklin Street depository and turn in the cannisters containing the day's collection.

Against that general description of collection procedures, we consider the motions. The City offered proof that the rotation system was not adhered to; that the daily assignments to trucks for collections were frequently made by the collectors themselves and that the management of Brink's was aware of this but did nothing to correct the situation. The jury could readily have found that the planned rotation system was honored more in the breach than in the observance.

In addition to two on-site inspectors at Franklin Street, Brink's was required to provide an inspector to observe the performance of crews in the field which it failed to do. Donovan, an on-site supervisor, did go out into "the field" and at times engaged in covert observations of meter collections; however, when he became aware of deviations from company rules he failed to make a complete investigation. In one instance, he observed a collector take a coin box, place it underneath his jacket, empty its contents and then place it back into the meter. Yet the employee was permitted to continue on the job without interception; no explanation was sought nor any disciplinary action taken.

Evidence was also submitted from which the jury could fairly infer that Brink's, after notification that a substantial number of cannister keys were missing, had failed to take adequate measures to protect the security of the keys despite the fact that the City had stressed the importance of their proper return at the end of the day's collection since a key could open any box in the City. On one occasion, Donovan was informed by an employee that the first time he worked with a fellow employee a cannister key was missing, yet no action was taken. It is not seriously disputed that cannister keys played an important role in the theft of the coins. Similarly, when the City complained that collectors were turning in bashed in cannisters or ones with broken goosenecks that suggested tampering by collectors, no effective action was taken. Brink's' contention that its proof established the City was responsible for the thefts because it failed adequately to protect the keys reargues its position of contributory negligence on the part of the City, which the jury rejected. The totality of evidence as to Donovan, by itself, permitted a fair-minded jury to conclude that there were shortcomings not only in his inspections but in follow-up procedures. There was additional evidence with respect to other and higher management officials which reflected inadequate inspection and supervision procedures.

The City had complained to Brink's on a number of occasions that its employees were not following assigned routes. Proof was offered that Brink's had failed to enforce its own rules against unauthorized stop-offs during collection. The jury also had evidence of instances where information had been received by or conveyed to Brink's that some employees were engaged in converting collected funds and that Brink's thereafter had failed to conduct a normal and reasonable investigation into alleged illegal acts. Considering the number of meters from which collections were to be made, the vast area to be covered and the information of pilfering which had come to Brink's attention, it was within the province of the jury to decide whether a sufficient number of personnel were engaged to supervise meter collections.

In sum, substantial evidence permitted the jury to find as a fair inference that had Brink's taken reasonably prudent measures, it would have been afforded the opportunity to ascertain those who were engaged in the illicit conduct, which could have prevented further thefts in two ways: (1) by the discharge of dishonest employees, and (2) by the deterrent impact that the knowledge of discharges and ongoing investigations of suspicious conduct would have upon other employees.

The fact that Brink's' hiring practices were adequate, as the jury found, did not end its duty of supervision of its employees. To be sure, Brink's had the right to assume that once hired, employees would honestly and faithfully perform their assigned tasks.[11] But that assumption was not the end of its duty. Its employees were collecting thousands of dollars on a daily basis in small coins. The rotation system itself was recognition that employees entrusted with large sums of money at times may yield to temptation and that security problems were inherent in the collection system. Even more important is the fact that from time to time information of a reliable nature had come to Brink's' attention that its employees were pilfering the coin box proceeds or there were reasonable grounds to believe that such activities were going on. In such circumstances, it could not deliberately blind its eyes to the obvious; Brink's was required to exercise reasonable care to investigate matters of which it had knowledge in an effort to detect wrongful conduct to prevent its continuance.[12] The evidence was sufficient to permit a finding that it did not do so.

So, too, the fact that the City independently conducted a parking meter investigation on its own or surveillance of Brink's' employees did not relieve Brink's of its obligation to take appropriate action once it was in possession of facts which reasonably raised a question of the employees' trustworthiness. The responsibility for collection of coin deposits and turning over the full amount collected was Brink's' and not the City's—that was the very purpose of the contract. There was substantial evidence to uphold the jury finding that Brink's was negligent both with respect to supervision and inspection and that this was a proximate cause of the loss of collections.[13]

Brink's next urges that the million dollar compensatory damage award should be set aside because, in its words, it is "so grossly shocking to the judicial conscience as to compel the conclusion that it was a product of passion and prejudice." The award does not shock this "judicial conscience"—quite the contrary, it is fair and reasonable and entirely consistent with the evidence that was offered on the issue of damages. The issue was sharply contested. The City, to establish damages, in large measure relied upon expert testimony. In brief, the City's expert used a comparison method. He compared the collections made by Brink's during the last ten months it was on the job with the first ten months' collections made by its successor. Based upon his judgment that differences in various nonculpable factors had been adequately accounted for and that conditions in the comparison periods were substantially the same, the expert concluded that Brink's had collected in the comparable period some $1,400,000 less than the successor company. In addition, documentary and other evidence was submitted that was probative on the damage issue. Brink's' experts challenged the methodology employed by the City's expert and contended that conditions in the comparison periods were not substantially similar. The method employed by the City's expert to calculate the damages was somewhat akin to that upheld in *Bigelow v. RKO Radio Pictures, Inc.*[14] which recognized that when a defendant's tortious conduct is of a nature that precludes precise ascertainment of damages, the jury may make "a just and reasonable estimate of the damage based on relevant data."[15] The

11. *Caledonia Ins. Co. v. National City Bank,* 208 A.D. 83, 86, 203 N.Y.S. 32, 35–36 (1st Dep't 1924); *Ehrich v. Guaranty Trust Co.,* 194 A.D. 658, 664, 186 N.Y.S. 103, 107 (1st Dep't 1921), aff'd, 233 N.Y. 637, 135 N.E. 950 (1927).

12. *Whittaker v. Delaware & Hudson Canal Co.,* 126 N.Y. 544, 549, 27 N.E. 1042, 1044 (1891).

13. *Cf. The T.J. Hooper,* 60 F.2d 737, 740 (2d Cir. 1932) (L. Hand, J.), *cert. denied,* 287 U.S. 662, 53 S.Ct. 220, 77 L.Ed. 571 (1932).

14. 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946).

15. *Id.* at 264, 66 S.Ct. at 579. *See also Lee v. Joseph E. Seagram & Sons, Inc.,* 552 F.2d 447, 454–56 (2d Cir. 1977); *National Conversion Corp. v. Cedar Building,* 23 N.Y.2d 621, 630,

conflicting evidence on the issue of damages was for jury determination. The jury was instructed that it was not to guess or speculate but was to make a fair and reasonable estimate based solely and only on the evidence in the case. The Court directed the jury's attention to the conflict between the experts, emphasizing their differing opinions, particularly as to the issue of the substantial similarity of conditions in the comparative periods. Instructions were also given as to the evaluation of expert testimony and the jury's right to accept or reject it. There was ample evidence to sustain the damage award.

■■■■ Brink's further challenges the million dollar award on the ground that it is the result of "passion and prejudice" and is disparate when compared with its own recovery of $5,000 each against its ten employees, a total of $50,000. This contention disregards the fact that the City charged, and offered evidence of, concerted illicit activity over a substantial period involving not only the known and identified employees but also unknown and unidentified employees. The City had always contended that other employees in addition to the accused were involved in the systematic stealing of meter funds and, indeed, there was substantial evidence upon which the jury could reasonably conclude that the conspiracy did include other employees. Moreover, even assuming that the award in favor of Brink's against its employees may be deemed disparate compared to the award in favor of the City against Brink's, as Brink's itself recognizes, "[i]nconsistent verdicts upon different counts or claims are not an anomaly in the law, which at times recognizes a jury's right to an idiosyncratic posi-

tion, provided the challenged verdict is based upon the evidence and the law." [16] Here, indeed, there was substantial evidence to uphold the amount of the award in favor of the City. [17] Brink's' various motions with respect to the compensatory damage award in favor of the City are denied. However, its motion for the entry of judgment jointly against those employees who were found liable to Brink's is granted.

■■■ We next consider the motion to set aside the $5,000,000 punitive damage award on the ground that (1) the evidence does not warrant any verdict, and (2) it is excessive. Thus there are two aspects to the motion. Relevant to the first is the nature and purpose underlying the concept of punitive damages. Its history and development from early English law have been traced by Judge Friendly, in his usual scholarly approach, in an opinion which considered New York law that is applicable in this diversity case. [18] After an analytical review of New York cases which variously defined the conduct required to support a punitive damage award as "utter recklessness," "reckless and of a criminal nature," "wanton or malicious," "gross and outrageous" or "recklessly and wantonly," Judge Friendly concluded that in ultimate terms the conduct that will give rise to punitive damages under New York law must be "close to criminality." [19]

The New York Court of Appeals' most recent statement as to what is required to authorize the imposition of punitive damages is:

... misconduct which transgresses mere negligence, as when the wrongdoer has acted "maliciously, wantonly, or with a recklessness that betokens an important

---

246 N.E.2d 351, 356, 298 N.Y.S.2d 499, 506 (1969).

**16.** *Malm v. United States Lines, Co.,* 269 F.Supp. 731, 731–32 (S.D.N.Y.), *aff'd per curiam,* 378 F.2d 941 (2d Cir. 1976). *See also Dunn v. United States,* 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356 (1932) (Holmes, J.); *Jayne v. Mason & Dixon Lines, Inc.,* 124 F.2d 317, 319 (2d Cir. 1941) (L. Hand, J.) (verdict may be upheld even "if no rational reconciliation of the verdicts was possible").

**17.** Brink's offered no evidence against its employees on its third-party claims. It relied upon the City's proof to sustain its burden of establishing systematic stealing by employees.

**18.** *Roginsky v. Richardson-Merrell, Inc.,* 378 F.2d 832 (2d Cir. 1967).

**19.** *Id.* at 843.

motive of vindictiveness" ... or has engaged in "outrageous or intentional misconduct" or with "reckless or wanton disregard of safety or rights."[20]

[17] This Court, upon a study of its own trial abstract and a close re-reading of pertinent portions of the trial record, is satisfied that there was sufficient evidence of "reckless or wanton disregard" of the rights of the City to support an award of punitive damages. The jury could reasonably have found that over a substantial period Brink's' senior management officials, with knowledge of repeated illicit activities and violations of company rules by a number of employees, failed to take appropriate investigative measures in an effort to apprehend and discharge dishonest employees. Thus with reliable information that employees were either stealing or had been observed on occasions, in violation of regulations, deviating from assigned routes, stopping off and carrying heavy bags that appeared to contain coins into residences of employees and other suspicious circumstances of pilferage of meter collections, Brink's' management made no adequate investigation and even ignored some situations. The jury was justified in finding that such conduct was reckless, indifferent and disregarded the risk of injury to the City's rights.[21] In one instance, following receipt of confidential and reliable information that an employee was stealing, the surveillance of that employee failed to track him from his last meter pickup to the time he checked in at Franklin Street.

The rather cavalier attitude of responsible management may be gleaned from an incident previously referred to when Donovan, a supervising inspector, saw an employee open a coin box, empty its contents into his pocket and then return the emptied coin box to its place in the meter. Donovan's superior, to whom the incident had been reported, when questioned as to the failure to undertake disciplinary proceedings against the employee, responded rather incredibly, "[t]here is no proof ... the man stole .... We have no proof of the reason why he put that in his pocket."[22] Despite Donovan's own view that the funds had been stolen, no action of any kind was taken with respect to this employee; he was permitted to remain on the job. There were other instances of conduct which permitted the jury reasonably to conclude wanton indifference to a known situation. In totality, the conduct of senior management was of the type where "[e]xemplary damages are intended to inject an additional factor into the cost-benefit calculations of companies who might otherwise find it fiscally prudent to disregard the threat of liability."[23] The motion to set aside the punitive damage award for lack of substantial evidence is denied.

 Accepting that the jury's verdict was based upon sufficient evidence to cast Brink's in liability for punitive damages, the issue remains whether the amount awarded is so excessive that it should be set aside. Punitive damages may be awarded in a limited number of instances "where the wrong complained of is morally culpable, or is actuated by evil and reprehensible motives.... It is a social exemplary 'remedy', not a private compensatory remedy."[24] The cases run the gamut of fraud, libel, false imprisonment, and others of like nature involving personal malice,[25] which

20. *Sharapata v. Town of Islip,* 56 N.Y.2d 332, 452 N.Y.S.2d 347, 437 N.E.2d 1104 (N.Y. Ct. App. 1982) (citations omitted).

21. *See Doralee Estates, Inc. v. Cities Service Oil Co.,* 569 F.2d 716, 722 (2d Cir. 1977) ("test [for holding corporation liable for punitive damages] is whether the continuing tortious conduct has been brought home to the consciousness of relatively important managerial personnel with authority to make a decision for the corporation that would have prevented the damage").

22. Record at 1013.

23. *Doralee Estates, Inc. v. Cities Service Oil Co.,* 569 F.2d 716, 723 (2d Cir. 1977).

24. *Garrity v. Lyle Stuart, Inc.,* 40 N.Y.2d 354, 358, 353 N.E.2d 793, 795, 386 N.Y.S.2d 831, 833 (1976).

25. *Cf. Walker v. Sheldon,* 10 N.Y.2d 401, 404, 179 N.E.2d 497, 498–99, 223 N.Y.S.2d 488, 490–91 (1961); *Le Mistral, Inc. v. Columbia Broadcasting System,* 61 A.D.2d 491, 494, 402 N.Y.

have, in addition to damage upon the immediate victim if repeated, the potential of injurious impact upon the public at large. The imposition of punitive damages is not for the benefit of the successful private litigant, but for the good of the public, principally for its deterrence against a repetition by the same offender or by others who may be bent upon the same offensive conduct.[26]

If the damage award is to serve its intended objective of punishment for wrongful conduct and deterrence against repetition of a like offense, it must be sufficient to "smart" the offender which permits a consideration of the wealth of the malefactor.[27] There are no precise standards to guide the jury. In effect, the jury functions in a quasi-judicial capacity and is vested with a broad discretion in assessing punitive damages.[28] However, this broad discretion is not without its limits. The court may intervene and set aside a verdict when the amount of the award is so excessive that it shocks the judicial conscience or it appears that it is the result of passion and prejudice. Against that general background of the concept of punitive damages, we consider the instant motion.

Conceptually, the central core of the City's claims derives from a contract.

New York State has frowned upon punitive damage awards in mere breach of contract claims, "for in such a case only a private wrong, and not a public right is involved."[29] However, in addition to its claim for negligent breach of contract, the City asserted a separate and independent cause of action for common law negligence.[30] The two claims were interlaced with one another and essentially rested upon the same conduct. The jury was instructed that if it found, by clear and convincing evidence, Brink's' conduct went beyond mere negligence and amounted to gross negligence which involved "willful, wanton and reckless conduct," it was authorized, but was not required, to award punitive damages. The jury by its verdict necessarily found such conduct. But this type of conduct—the nonperformance of a contractual obligation—is a far cry from the underlying rationale of New York cases supporting substantial punitive damage awards. Even accepting the jury's verdict that the officials of Brink's were grossly negligent in disregarding the City's interest, the potential likelihood of injury to others was minimal; in such circumstances the amount of punitive damages must be "carefully restrained by practical considerations"[31] and "have some relation to reality."[32] As one court has observed, "even outrageous conduct will

S.2d 815, 817 (1st Dep't 1978) ("As a general rule, exemplary damages are recoverable in all actions ex delicto based upon tortious acts which involve ingredients of malice, fraud, oppression, insult, wanton or reckless disregard of the plaintiff's rights. . . .")

26. *Reynolds v. Pegler,* 123 F.Supp. 36, 39 (S.D. N.Y. 1954), *aff'd,* 223 F.2d 429 (2d Cir. 1955).

27. *Fury Imports, Inc. v. Shakespeare Co.,* 554 F.2d 1376, 1389 (5th Cir. 1977) (applying New York law), *cert. denied,* 450 U.S. 921, 101 S.Ct. 1369, 67 L.Ed.2d 349 (1981); *Rupert v. Setters,* 48 A.D.2d 265, 269–72, 368 N.Y.S.2d 904, 910–13 (4th Dep't 1975); *Herman v. Hess Oil Virgin Islands Corp.,* 379 F.Supp. 1268, 1276 (D.V.I. 1974), *aff'd,* 524 F.2d 767 (3d Cir. 1975); Restatement (Second) of Torts § 908(2) (1977).

28. *Reynolds v. Pegler,* 123 F.Supp. 36, 39 (S.D. N.Y. 1954), *aff'd,* 223 F.2d 429 (2d Cir. 1955).

29. *Garrity v. Lyle Stuart, Inc.,* 40 N.Y.2d 354, 358, 353 N.E.2d 793, 795, 386 N.Y.S.2d 831, 833 (1976). *See also Gordon v. Nationwide Mut.*

*Ins. Co.,* 30 N.Y.2d 427, 437, 334 N.Y.S.2d 601, 604, 285 N.E.2d 849, 852 (1972) (punitive damages not applied routinely for breach of contract; bad faith requires an extraordinary showing of disingenuous or dishonest failure to carry out contract).

30. *Cf. Hargrave v. Oki Nursery, Inc.,* 636 F.2d 897, 899 (2d Cir. 1980) (fact that acts constitute a breach of contract does not mean they cannot give rise to liability in tort; where conduct alleged breaches a legal duty which exists independent of contractual relations between parties, plaintiff may sue in tort).

31. *Doralee Estates, Inc. v. Cities Service Oil Co.,* 569 F.2d 716, 722 (2d Cir. 1977).

32. *Faulk v. Aware, Inc.,* 19 A.D.2d 464, 470, 244 N.Y.S.2d 259, 265 (1st Dep't 1963), *aff'd,* 14 N.Y.2d 899, 200 N.E.2d 778, 252 N.Y.S.2d 95 (1965).

not support an oppressive or patently excessive award of damages." [33]

This was not a case of products liability involving an injurious or poisonous drug that has been widely distributed,[34] or a vehicle with a dangerously defective mechanism that has been installed in thousands of cars [35] with their potentiality for death or lifetime crippling effects; nor is it a libel suit reflecting elements of personal ill will or hostility and ofttimes with the prospect of repetition as part of a business policy or fraudulent conduct.[36] In such instances there is justification for imposition of substantial punitive damage awards. Here, in contrast, the immediate impact of the wrongful conduct was upon the City, one of the contracting parties, and there is little prospect that repetitive conduct will occur and injure others.[37] The consumer that may seek to avail itself of Brink's' parking meter collection services is severely limited to municipalities or public agencies. In addition, the resulting injury, assuming repetitive conduct, is to property—the loss of money, not death or severe personal injury. If an essential purpose of punitive damages is its deterrent force, these are factors that may properly be considered in assessing the amount of the fine—they are germane just as the financial capacity of the offender is relevant in deciding whether an award will be of sufficient force to achieve its intended purpose of deterrence.[38] The jury had the right to impose an adequate fine but not an excessive fine. A jury no more than a judge is authorized to impose an excessive fine.[39] While it is true there is no yardstick to guide a jury in assessing punitive damages and, accordingly, it is vested with a vast discretion,

there are limits beyond which a jury should not be permitted to go. It is the duty of the court to keep a verdict for punitive damages within reasonable bounds considering the purpose to be achieved as well as the *mala fides* of the defendant in the particular case.[40]

[29] Of course, it is not known what factors entered into the $5,000,000 award—a very substantial sum even in these inflationary days. We do know the jury had before it the 1981 annual 10–K report filed with the Securities and Exchange Commission by the Pittston Company, the parent of Brink's. The City's counsel in summation emphasized the wealth and the average annual revenues of the parent, which indeed were substantial and far beyond that of Brink's', and noted that it was one of the largest companies in the United States. He suggested to the jury that an award of $10,000,000 would be but a small percentage of Pittston's annual gross

**33.** *Herman v. Hess Oil Virgin Islands Corp.,* 379 F.Supp. 1268, 1276 (D.V.I. 1974), *aff'd,* 524 F.2d 767 (2d Cir. 1975).

**34.** *See Roginsky v. Richardson-Merrell, Inc.,* 378 F.2d 832 (2d Cir. 1967); *Toole v. Richardson-Merrell, Inc.,* 251 Cal.App.2d 689, 60 Cal. Rptr. 398 (1967).

**35.** *See Dorsey v. Honda Motor Co.,* 655 F.2d 650 (5th Cir. 1981). *Cf. Gillham v. Admiral Corp.,* 523 F.2d 102 (6th Cir. 1975), *cert. denied,* 424 U.S. 913, 96 S.Ct. 1113, 47 L.Ed.2d 318 (1976) (television sets contained transformers which caught fire).

**36.** *See Curtis Publishing Co. v. Butts,* 388 U.S. 130, 159–61, 87 S.Ct. 1975, 1993–94, 18 L.Ed.2d 1094 (1967); *Reynolds v. Pegler,* 123 F.Supp. 36 (S.D.N.Y. 1954), *aff'd,* 223 F.2d 429 (2d Cir. 1955); *Le Mistral, Inc. v. Columbia Broadcasting System,* 61 A.D.2d 491, 402 N.Y.S.2d 815 (1st Dep't 1978); *Fittipaldi v. Legassie,* 18 A.D.2d 331, 239 N.Y.S.2d 792 (4th Dep't 1963).

**37.** The City in its brief on this motion in urging that the amount of the punitive damage award be upheld noted, ". . . there are no other potential plaintiff's [sic] waiting to sue Brink's for its performance on the New York City parking meter contract. . . ." City's Brief in Opposition to Motion to Set Aside Jury Verdict at 46–47.

**38.** *See* note 27 *supra.*

**39.** *Cf. United States v. United Mine Workers,* 330 U.S. 258, 304–06, 67 S.Ct. 677, 701–02, 91 L.Ed. 884 (1947).

**40.** *Reinah Development Corp. v. Kaaterskill Hotel Corp.,* 86 A.D.2d 50, 448 N.Y.S.2d 686, 689 (1st Dep't 1982), quoting *Faulk v. Aware Inc.,* 19 A.D.2d 464, 472, 244 N.Y.S.2d 259, 266 (1st Dep't 1963), *aff'd* 14 N.Y.S.2d 899, 200 N.E.2d 778, 252 N.Y.S.2d 95 (1964).

revenue. The subsidiary and not the parent was the wrongdoer. That the jury awarded half of the suggested amount does not diminish the fact that in this Court's view, under all the circumstances of this case, the award is excessive. Accordingly, the award is set aside.

The trial extended over a period of almost four weeks with a record of more than 3,000 pages of testimony. As the Court noted to the jury, the lawyers represented their clients with conspicuous ability and all issues were fully canvassed and argued. A new trial is not likely to produce additional evidence. The Court is satisfied that the interests of the parties and justice will be served by a remittitur. Upon further consideration of the entire record and the component elements which should be taken into account, the motion for a new trial is granted unless the City agrees to a remittitur to reduce the punitive damage verdict to the sum of $1,500,000. If the City does not consent to the remittitur within ten days from the date of this opinion, a new trial is ordered limited solely to the amount of punitive damages. The jury's finding that the City has established its burden of proof on the issue of punitive damages shall remain undisturbed.

So ordered.