Jason B. **GARDNER**, Plaintiff,

v.

**FEDERATED DEPARTMENT STORES, INC., Defendant.**

**No. 85 Civ. 2816 (WK).**

United States District Court, S.D. New York.

June 26, 1989.

On Motion for Reconsideration July 24, 1989.

Thus, as to this product that issue is moot.

Robert L. Herbst, New York City, for plaintiff.

Charles P. Duffy, Dwyer & Duffy, P.C., Semel, Schepp & Yuhas, New York City, for defendant.

## MEMORANDUM & ORDER

WHITMAN KNAPP, District Judge.

Jason Gardner brought suit against Federated Department Stores, Inc. ("Federated"), the corporate parent of Bloomingdale's department store, alleging false imprisonment, false arrest, battery, malicious prosecution and abuse of process. After a four-day trial, the jury awarded damages totalling $2.3 million—$150,000 for the deprivation of liberty, $150,000 for pain and suffering up to the date of the verdict,

$500,000 for future pain and suffering and $1,500,000 in punitive damages. Defendant moves to set aside the verdict as excessive and contrary to the weight of the evidence.

For reasons which follow, we deny defendant's motion except to the extent that we direct plaintiff to remit $490,000 of the amount he was awarded for future pain and suffering. If plaintiff declines to remit that amount, we shall order a new trial limited to the issue of future pain and suffering.

## BACKGROUND [1]

For approximately five years before the events giving rise to this lawsuit, plaintiff worked, primarily at Bloomingdale's in Manhattan, as a free-lance promotional model, displaying and selling perfume. On April 16, 1984, he returned to Bloomingdale's a gray jacket that he had purchased a few days earlier. Although he did not have a receipt for the jacket, the supervisor at the return desk agreed to process the return using a receipt for the same amount of money for a black jacket plaintiff had also purchased.

Three days later, on April 19, 1984, plaintiff, wearing the black jacket, returned to the store, this time to visit his friend Arielle Stern. Ms. Stern, who also worked as a free-lance promotional model, gave him some free samples and agreed to meet him for dinner after she finished her shift. As plaintiff waited for her outside the store, James Boyce, a security executive who was second in command for internal corporate investigations and responsible for internal investigations and security audits in Bloomingdale's stores nationwide, and a second unidentified security officer accosted plaintiff. They twisted his hands behind his back, handcuffed him, picked him up and dragged him back into the store. In full view of customers and employees, they dragged him across the selling floor and pushed him through the swinging doors that opened onto the stairs leading to the security office, causing him to fall and bruise himself. They then picked him up and pulled him up the stairs. Once in the security office, they put him in a cell and searched through his belongings. Other unidentified security officers taunted him, calling him a "blond faggot."

After plaintiff was unable to produce any document of identification, Boyce told him that it was illegal not to carry identification. He then read plaintiff his *Miranda* warnings and began to interrogate him, demanding that he reveal who had given him the samples. He threw a bag of clothes at plaintiff, and asked him if he had earlier returned a jacket for credit. Plaintiff refused to answer.

Boyce placed a printed "confession" form in front of plaintiff and directed him to sign it. The form stated that plaintiff admitted that he had stolen merchandise from Bloomingdale's and agreed not to enter the store for seven years. Plaintiff, denying that he had stolen anything, refused to sign the form and asked to speak with a lawyer. Boyce refused this request.

Plaintiff then asked to go to the bathroom, a request that was at first similarly denied. Then, after a time, another security officer (also unidentified) escorted him to the bathroom and removed the handcuffs. When that officer put the handcuffs back on plaintiff's wrists to return him to the cell, he fastened them so tightly that they cut him. Later, plaintiff was taken from the cell back to Boyce's office. When plaintiff again refused to sign the confession form, Boyce came around his desk to where plaintiff, handcuffed and defenseless, was sitting and repeatedly punched him very hard in the ear.

The security officers conversed with one another within plaintiff's earshot, saying that they "didn't have anything on him" and that "American Express won't do anything." They nevertheless turned him over to the police at about 10:30 P.M. He had been in Bloomingdale's custody for almost two hours.

The police transported him to Central Booking, fingerprinted and photographed him. He was put into a cell with about thirty-five other prisoners, many of whom,

---

**1.** We summarize the evidence in the light most    favorable to plaintiff.

plaintiff learned, had been apprehended on charges of drug dealing or rape. Some of them menaced plaintiff, demanding candy and money and trying to take his watch.

At about 4:30 A.M., Ms. Stern, the co-worker with whom he had planned to dine the night before, and her husband secured plaintiff's release by posting $1000 bail. After a few hours, plaintiff went to court to wait for his case to be called. He spent the entire day there and returned on each of the next three days, waiting from early morning to late at night until on the fourth day he was permitted to enter his plea of not guilty. Over the next several months, he was required to make several court appearances until his case was finally dismissed.

After continuing to work in various department stores—including Abraham & Straus which was owned by defendant Federated—for a year after the incident, plaintiff moved to California to try to escape his memories. Unemployed for a time, he now works with Ms. Stern at a catering concern.

Dr. Gerald Appelle, an expert dental witness retained by defendant, examined plaintiff four years after the incident. According to his report, which plaintiff offered in evidence, plaintiff suffers from symptoms consistent with temporo-mandibular joint syndrome, a malady commonly known as "TMJ". His symptoms, which plaintiff testified still continue, include tenderness in his front mandibular joint and left masseter muscle, an inability completely to open his mouth, a jaw that periodically goes out of joint or locks causing a cramp-like pain, and a clogging and buzzing sensation in his ear when he swims or, sometimes, when he showers. According to plaintiff, he can no longer swim, which up until the incident was his favorite means of recreation. Nor can he can eat certain foods or bite down hard. Dr. Appelle was of the opinion that it was "possible that the blow received to the jaw could have result-

ed in the condition described." He found it "difficult to evaluate the degree of permanency especially since very little therapy has been received to date." (Pl.Ex. 11). Dr. Appelle's report was the only medical evidence on plaintiff's dental condition.[2]

Plaintiff testified that since the incident he has experienced severe anxiety when entering a department store or watching a police or courtroom drama on television, has changed from an outgoing person into a "loner", suffers from low self-esteem, finds it difficult to control his eating and has recurring stomach cramps and diahrrea. He often relives the incident, suffering great emotional pain each time. He worries that he might again be arrested. According to Ms. Stern, he continually washes his hands and appears worried about leaving fingerprints. Plaintiff admitted that he had not made any effort to seek psychiatric treatment. The psychiatric experts retained by plaintiff and defendant agreed that plaintiff suffered from extreme anxiety and avoidance behavior, but that his condition might improve if he saw a psychiatrist. Dr. Peter Schiffman, the expert retained by plaintiff, pointed out, however, that the longer plaintiff delays, the less likely it will be that he will respond to psychiatric treatment. After considerable hemming and hawing, Dr. Schiffman opined that, without treatment, the condition would probably be permanent. Dr. Morton Marks, the expert retained by defendant, on the other hand, was of the view that plaintiff could resume his normal occupational activities.

Although the testimony suggested that, for plaintiff, the events of April 19, 1984 were pivotal, defendant apparently did not deem them of any significance. John Harden, Bloomingdale's director of security, testified at his deposition that he did not learn of the incident until three and one half years after its occurrence and two and one half years after this lawsuit had been filed. He further testified that neither Federated nor Bloomingdale's had any

2. Although Dr. Appelle was in the courthouse pursuant to plaintiff's subpoena, neither party called him to the stand.

practice of reviewing allegations of wrong-doing by the security staff, and that there existed no procedure for bringing such complaints to the attention of any executive.

During more than three years of discovery, defendant insisted that it had no way of identifying a single one of the security officers—other than Boyce—who had been directly involved in plaintiff's detention. It further claimed that Boyce had left Bloomingdale's employ and that it was wholly impossible to locate him. It also claimed throughout the entire period of discovery that it was impossible to ascertain the whereabouts of Tom Hayden, a sales clerk who had been involved in processing the return of plaintiff's jacket.

The trial started on Tuesday, April 25, 1989. Defense counsel told us that he had not been retained until the previous Friday and that his investigator would be, as the trial proceeded, trying to locate witnesses. Defendant did not present a single witness who contradicted or in any way questioned plaintiff's account of the circumstances surrounding his apprehension. After both sides had rested, however, defense counsel informed us that his investigator had, in only three days, succeeded in finding the elusive Mr. Hayden.[3]

Defendant's sole defense seemed to be that plaintiff's arrest was somehow justified by some sort of fraud surrounding plaintiff's return of the gray jacket some days previously. We ultimately rejected that defense as a matter of law and directed a verdict on the false arrest and false imprisonment claims.[4] Concluding that any damages the jury might award for malicious prosecution or abuse of process would duplicate those awarded for false arrest and false imprisonment, we submitted only the battery claim to the jury. After a short period of deliberation, the jury returned with a finding that plaintiff had established his claim for battery. As

above stated, the jury awarded $150,000 to compensate plaintiff for the time he was deprived of his liberty as a result of the security officers' actions, $150,000 for his pain and suffering up to the date of the verdict, $500,000 for his future pain and suffering and $1,500,000 in punitive damages.

## DISCUSSION

■ Defendant's insurance carrier, Liberty Mutual Insurance Co. ("Liberty Mutual"), retained counsel for the defendant and controlled the defense of the case. As is often the case, the insurance company expended as few resources as possible, no doubt hoping to settle before trial. As late as September 1988, however, the insurance company had not offered plaintiff more than $6000. It told the court in confidence that it might be willing to pay as much as $15,000, while plaintiff likewise in confidence said he would settle for $75,000. In an effort to stimulate settlement discussions, we suggested that the case, if it settled at all, might settle at $25,000. This suggestion produced no reaction from the carrier. When the trial date arrived, defendant was utterly unprepared to defend itself, lacking trial counsel knowing anything about the case, or a single witness able to question plaintiff's account of the events.

Perhaps, this is over the long run a cost-effective way for an insurance company to conduct its business. When a case does proceed to trial, however, the company subjects itself to a significant risk of spectacular defeat. Since, in the instant case, Liberty Mutual deliberately chose not to prepare for trial, it cannot be heard to complain that its strategy backfired and it is faced with paying a substantial judgment. *Cf. Bevevino v. Saydjari* (S.D.N.Y. 1977) 76 F.R.D. 88, *aff'd on other grounds,* (2d Cir.1978) 574 F.2d 676. As the law requires, we here discuss not what might

---

**3.** We excluded Mr. Hayden's testimony as untimely and irrelevant.

**4.** G.B.L. § 218 renders privileged detention by store security officers when they observe someone stealing or trying to steal merchandise and

for only so long as is reasonably necessary to investigate. The statute did not authorize the officers to detain plaintiff nearly two hours on the unsubstantiated suspicion that he had committed some sort of fraud three days earlier.

have been the situation had the case been properly defended but what inferences the jury was entitled to draw from the evidence actually before it. We look to see whether—in that view of the situation—the compensatory or punitive awards were so high as to shock our conscience or to constitute a denial of justice. *Zarcone v. Perry* (2d Cir.1978) 572 F.2d 52, 56–57.

■ We first turn to compensatory damages. Based on the evidence detailed above, our conscience is by no means shocked by the award of a total of $300,000 for the deprivation of liberty and for pain and suffering up to the date of the verdict. Although it seems probable, however, that plaintiff is entitled to some damages for future pain and suffering, our conscience is shocked by the award of $500,000. Because neither party seemed to have fully developed the issues crucial to ascertaining future damages, the record is replete with unanswered questions. For example, why did plaintiff, who claimed to have been morbidly frightened of even entering a department store, continue to work in such stores for approximately a year after the incident? Why, if each visit to a department store caused plaintiff such pain, was he unable to remember on what days or for how many days he had worked in each of several department stores during that year? Why did not plaintiff at least try to find out whether psychological counselling within his budget was available? Is it likely, given that plaintiff's career path mirrored that of his friend, Ms. Stern, who never seems to have had any problem with any employer, that plaintiff's leaving department store work in New York for catering in California was a result of this incident? Why did not the plaintiff consult a doctor—or even a swimming coach—to see if earplugs or some other simple remedy would allow him to continue swimming, allegedly his favorite pastime? Why, if in fact "TMJ" subjects plaintiff to such misery, has he not aggressively pursued treatment? Indeed, Dr. Appelle, the only dental expert whose opinion was before the jury, declined to speculate on the permanency of plaintiff's condition "since very little therapy has been received to date." As above indicated, we direct that plaintiff remit $490,000 of the $500,000 he was awarded for future pain and suffering or face a trial limited to that issue. If plaintiff chooses a new trial, we shall reopen discovery to allow the parties to develop a fuller record on future damages and plaintiff's efforts, if any, to mitigate those damages.

■ We now turn to punitive damages. Punitive damages may be imposed on a corporation for the intentional wrongdoing of its employees "where management has authorized, participated in, consented to or ratified the conduct giving rise to such damages or has deliberately retained the unfit servant ... or the wrong was in the pursuance of a recognized business system of the entity." *Loughry v. Lincoln First Bank, N.A.* (1986) 67 N.Y.2d 369, 378, 502 N.Y.S.2d 965, 969–70, 494 N.E.2d 70, 74–75, *citing, inter alia, Stevens v. O'Neill* (1st Dept.1900) 51 A.D. 364, 64 N.Y.S. 663, *aff'd* 169 N.Y. 375, 62 N.E. 424. In *Stevens,* a woman was falsely imprisoned on suspicion of stealing a watch. The court upheld the jury's award of punitive damages, observing (51 A.D. at 368, 64 N.Y.S. at 666):

> Although there was no evidence of any express malice against this plaintiff individually, the act was done in pursuance of a system which had been adopted in that store; and if this system was such as to place an innocent customer in the position in which plaintiff's evidence showed she was placed, the jury had the right to say that the results of this system were of such a character as to require rebuke by way of punitive damages in order that innocent people should not be placed in the position in which plaintiff was placed without fault on her part.

A corporate defendant's failure to investigate the wrongful conduct of its employees can also justify punitive damages. *Brink's Inc. v. City of New York* (S.D.N.Y.1983) 546 F.Supp. 403, 412 (Weinfeld, J.).

We have no doubt that the punitive damages award was warranted on at least three theories. First, Boyce, a high-ranking manager responsible for internal secur-

ity, not only acted without legal justification but also with gratuitous brutality. Second, the fact that Boyce tolerated and, it could be reasonably inferred from the evidence, encouraged by example his subordinates' abusive behavior supported the conclusion that it was Bloomingdale's "recognized business system" to improperly apprehend, harass and physically abuse persons it suspected of stealing. Third, the jury was entitled to decide, based on Federated's practice of never investigating complaints or even maintaining any facilities for such investigation, that outrageous conduct by the security staff was knowingly tolerated at the highest level of the corporation.[5]

■ Nor do we see a reason to reduce the award. Although there is no precise formula for arriving at a figure that will punish defendant for its misconduct, the jury is to consider the bad acts of the defendant and the underlying purposes of punitive damages. As Judge Weinfeld observed, if punitive damages are to deter defendant from engaging in similar outrageous conduct in the future and to serve as an object lesson to other corporations, it must be large enough to "smart" a little. *Id.* at 413. Defendant offered no evidence that its financial circumstances were such that a large punitive damage award would be unduly harsh. Perhaps this was a wise decision. We take judicial notice that Federated's revenues in 1987, the last year before it was acquired by the Campeau Corporation, exceeded $11 billion.[6] Given defendant's atrocious conduct and its significant wealth, we cannot say that the punitive damages award in any way shocks our conscience.

## CONCLUSION

We deny defendant's motion to reduce or set aside the verdict, except to the extent

that we direct plaintiff to remit $490,000 of his award for future pain and suffering.

SO ORDERED.

## ON MOTION FOR RECONSIDERATION

Our memorandum and order of June 26, 1989, familiarity with which is here assumed, has prompted both sides to make further motions. Plaintiff moves for reconsideration of our order directing that he remit $490,000 of the $500,000 jury award for future pain and suffering or submit to a new trial on that issue. Defendant, taking issue with our observation that its counsel neglected properly to prepare the defense, moves to reargue its motion to set aside the verdict for punitive and past compensatory damages. In the alternative, defendant moves to supplement the record. For reasons which follow, we deny both motions for reconsideration, but grant defendant's motion to supplement the record.

## DISCUSSION

■ Plaintiff argues that in our memorandum and order we improperly imposed on him the burden of proof on the issue of whether or not he took appropriate steps to mitigate his pain and suffering. He also purports to have unearthed in the record answers to several of the "unanswered questions" about extent of his future pain and suffering and his efforts to mitigate.

Plaintiff's contentions ignore two simple facts. First, plaintiff's testimony made it abundantly clear that he had failed to take any of the steps that a sensible person would have taken to mitigate his supposed future pain and suffering. Plaintiff's failure was so obvious that defendant could have borne its burden without introducing any evidence on the issue. Second, our decision was based on the fact that our conscience was shocked, not by the wholly ephemeral nature of the evidence introduced by both sides, but by the enormity of

---

**5.** Although the matter was not brought to the jury's attention, we cannot help but be influenced by defendant's conduct in falsely asserting during three years of discovery that it could not locate Boyce or any other of the persons involved. Aside from being ridiculous on its face, this assertion is belied by the ultimately

retained counsel's ability to locate Mr. Hayden in just three days.

**6.** Campeau Corporation, Annual Report filed with the Securities and Exchange Commission on July 15, 1988, p. 6.

the verdict in relation to that evidence. Accordingly, we deny plaintiff's motion for reconsideration.

In support of its motions, defendant submits the affidavit of Michele Schuster, Esq. Ms. Schuster was an associate at the firm of Semel, Boeckmann, Diamond Schepp & Yuhas ("Semel, Boeckmann"), counsel of record for defendant up until the day of trial. Ms. Schuster attempts, by suggesting that her firm was not notified until April 19, 1989 that the trial was to be held on April 25, to explain why on the eve of trial defendant retained new counsel completely unfamiliar with the case.

Notes contemporaneously prepared by our deputy clerk Bernard Wasserman show that, to the contrary, repeated attempts were made before April 19 to notify Ms. Schuster of the trial date. On April 10, Mr. Wasserman left telephone messages for plaintiff's counsel and for Ms. Schuster. That same day, plaintiff's counsel returned Mr. Wasserman's call and was told that the trial would likely begin on April 24. No one from Semel, Boeckmann, however, called Mr. Wasserman. On April 11, Mr. Wasserman again called Semel, Boeckmann and left a message for Ms. Schuster. As on the previous day, he received no response. On April 12, he called Semel, Boeckmann and left for Ms. Schuster the message that the trial would begin on or about April 24 and that he would call again to confirm the date. On April 19, he called Semel, Boeckmann and was at last able to speak directly with Ms. Schuster. When he told her that the trial would proceed on April 25, she protested that no one from her firm would be available to try the case on that date. Mr. Wasserman told her that any application for adjournment should be made not to him but to the court. Defendant made no such application, but instead proceeded to trial on April 25 represented by Charles Duffy, Esq. of the firm Dwyer & Duffy, P.C.

Ms. Schuster also attempts to excuse defendant's failure to locate James Boyce, a security executive who at the time he was involved in the incident giving rise to this lawsuit had been second in command for internal corporate investigations for Bloomingdale's stores nationwide. She says that she "canvassed" Bloomingdale's security staff, none of whom knew Boyce's current address. She provided plaintiff with Boyce's last known address and the last known address of a woman thought to be his girlfriend. We noted, both during the trial and in our post-trial memorandum, the absurdity of defendant's assertion it could not locate a former employee of Boyce's importance. So far as appears from Ms. Schuster's affidavit, Bloomingdale's itself was never asked to locate him. We deny defendant's motion to reconsider but grant its motion to supplement the record.

## CONCLUSION

We grant defendant's motion to supplement the record. We deny both motions for reconsideration.

SO ORDERED.