BRINK'S INC., Appellant,

v.

The CITY OF NEW YORK, Appellee.

BRINK'S INC., Appellant-Cross-Appellee,

v.

John ADAMS, Anthony De Nardo, Trevor Fairweather, Richard Florio, James Gargiulo, Michael Solomon, William J. Donovan, Francis Gitto, William McInerney, Anthony San Marco, James Springett, John Barrera and Joseph Nardo, Appellees,

and

Jorge Olivari, Ramon Hernandez, and Jose Rodriguez, Appellees-Cross-Appellants.

Nos. 953, 954, Dockets 82–7782, 82–7788.

United States Court of Appeals, Second Circuit.

Argued March 24, 1983.

Decided Sept. 6, 1983.

Robert A. Meister, Milgram, Thomajan, Jacobs & Lee, P.C., New York City (Victoria A. Cundiff, Andrew L. Deutsch, New York City, of counsel), for appellant-cross-appellee.

Jeffrey E. Glen, Sp. Asst. Corp. Counsel, New York City (Frederick A.O. Schwarz, Jr., Corp. Counsel, Debra A. James, Patricia Kruger, New York City, Edward C. Tuozzo, Staten Island, N.Y., Asst. Corporation Counsels, of counsel), for appellee City of New York.

Phillip M. Kovitz, New York City, for appellees-cross-appellants Olivari, Hernandez, and Rodriguez.

Before OAKES, CARDAMONE and WINTER, Circuit Judges.

OAKES, Circuit Judge:

The City of New York contracted out the collection of its parking meter revenues to Brink's Inc., the well-known national armored car carrier. Under the March 1978 contract, armed, uniformed Brink's personnel were to collect coins from parking meters throughout the City, deposit them into canisters sealed and locked by the City, and return the canisters to the City's parking meter division (PMD) at 42 Franklin Street in Manhattan. On April 9, 1980, seven Brink's collectors were arrested, five of whom were charged with and convicted of stealing parking meter revenues. The City suspended and ultimately cancelled the Brink's contract. On December 5, 1980, Brink's sued the City for money owed under the contract and the City counterclaimed charging breach of contract and negligence based upon lack of due care in hiring, failure to supervise and failure to investigate the parking meter collectors. Brink's served a third-party complaint on the seven employees above mentioned as well as five other employees and their supervisor, William J. Donovan.

The case was tried before a jury in the United States District Court for the Southern District of New York, Edward Weinfeld, Judge. Brink's had preliminarily moved to prevent the City from questioning any Brink's employees about matters with respect to which they could assert their privilege against self-incrimination, but Judge Weinfeld denied the motion. *Brink's, Inc. v. City of New York,* 539 F.Supp. 1139 (S.D.N.Y.1982). The jury, in a special verdict, found that the City had sustained its claim against Brink's for breach of contract and for negligence in failing to supervise and to investigate, but found for Brink's on the charge of negligence based upon lack of due care in hiring. The jury awarded the City $1 million compensatory and $5 million punitive damages. On the third-party complaint of Brink's Inc. against the individual collectors, ten of them were found severally liable in the amount of $5,000 each.

In a post-verdict opinion, *Brink's Inc. v. City of New York,* 546 F.Supp. 403 (S.D.N.Y.1982), Judge Weinfeld denied the Brink's motions for a directed verdict on the compensatory and punitive damage claims, Fed.R.Civ.P. 50(a), for judgment notwithstanding the verdict as to both damage awards, Fed.R.Civ.P. 50(b), and for a new trial on the ground that the awards were grossly excessive, Fed.R.Civ.P. 59. He did, however, allow a remittitur, to which the City subsequently agreed, of the $5 million punitive damage award to $1.5 million. *Id.* at 416. He also denied a motion by Brink's to set aside the verdicts on its indemnity claims against the collectors on the ground that they were inadequate, inconsistent, the result of passion and prejudice, and in disregard of the court's instructions. Alternatively, Brink's asked that the judgments against the ten individual employees be entered jointly because the jury found that each collector had acted jointly. This motion was granted; the motions of the collectors for directed verdicts and judgment notwithstanding the verdict were denied. Brink's appeals, as do three of the collectors found liable to Brink's: Jorge Olivari, Ramon Hernandez, and Jose Rodriguez. We affirm.

*FACTS*

The City of New York owns and operates approximately 70,000 parking meters, most-

ly on-street, but some in metered parking lots. Daily collections average nearly $50,-000. After public bidding in March of 1978, Brink's was awarded the contract to collect coins from these meters and deliver them to the New York City Department of Finance Depository. Brink's was reimbursed at the rate of 33 cents per day for each meter it collected. Operations under the contract commenced in May of 1978.

The process of collection involved collectors working in teams, with one individual going to each parking meter on a city-prescribed schedule.[1] To collect a meter, the collector would insert a meter key, open the bottom portion of the meter head, and remove a sealed coin box. This coin box would then be placed upside down onto a gooseneck protruding upward from a large metal canister on wheels, resembling a dolly, that the collector rolled along from meter to meter. By twisting the coin box, an unlocking device called a "canister key," attached to the canister by City personnel and theoretically not reachable by the collector, would allow the coins from the coin box to drop into the canister without the collector's having access to the coins. After the coin box was emptied the collector would replace it and lock the meter. Upon completion of a specific route the canister would be placed in a collection van. At the end of a given team's work on a particular day, the van was driven back to the PMD and the canisters were turned over to City personnel.

As can be seen from the above, collectors were not to have contact with the coins in the meters.[2] City personnel were to check each collection canister daily to ensure that it was in good working order; upon receipt of a canister the Brink's people signed a receipt attesting that it was in good working order. Under the contract, at the end of the day any canister malfunction or broken or uncollectible meters were to be re-

ported to the City. Brink's was to provide ten three-person collection crews daily, the crews to be rotated in the discretion of the City Department of Finance as a security measure. The City directed that the rotation should be accomplished by a lottery system to prevent the formation of permanent teams, but the City's evidence was that the rotation system was ignored. Daily assignments were frequently made by the collectors themselves and the management of Brink's was aware of this but did nothing to correct it. As the trial judge stated, the jury "could readily have found that the planned rotation system was honored more in the breach than in the observance." 546 F.Supp. at 409. The contract also provided that Brink's would provide supervisory personnel to oversee the proper performance of its obligations. Although the contract called for two supervisors and one field inspector, the full complement was never assigned.

In response to an anonymous tip, the City's Department of Investigation, in conjunction with the Inspector General's Office of the Department of Finance, began an investigation of parking meter collections. Surveillance of Brink's collectors revealed suspicious activity violative of both the City's and Brink's rules and procedures. The investigators then "salted" parking meters by treating coins with a fluorescent substance and inserting them into specific meters. "Salted" meters were checked after the coin boxes had been emptied by Brink's employees to make sure that all of the treated coins were collected; collections from the meters were then scanned to see if any treated coins were missing. The "salting" process indicated that a substantial percentage of coins collected by Brink's personnel were not being returned to the City. Surveillance at the 42 Franklin Street depository revealed that at the end of a day Brink's employees would often arrive in

---

1. For collection purposes the City is divided into areas. Each parking meter has a unique key; the keys are placed, in the proper order for collection, on wire cables.

2. City employees actually sorted and counted the coins using a system designed to prevent loss and pilferage. The jury specifically found that the City had not been contributorily negligent in connection with its losses, a finding that Brink's challenges and we consider *infra*.

personal vehicles following their assigned collection vans, indicating some kind of "drop-off." Brink's employees were also seen entering a parking lot in Manhattan in Brink's vans, removing bags from the vans, placing them in private automobiles and then returning to the vans to continue to the City depository. The City presented video tapes of these transfers at trial; Brink's collectors were shown straining to lift heavy bags into their cars. Brink's employees were also followed to a private residence and again observed carrying heavy bags from their vehicles into the building and emerging empty handed.

James Gargiulo, Trevor Fairweather, Richard Florio, Michael Solomon and John Adams were arrested and charged with grand larceny and criminal possession of stolen property when on April 9 they had in their possession over $4,500 in coins stolen *that day* from parking meter collections. Anthony DeNardo was arrested and charged with petit larceny and criminal possession of stolen property. A charge against Jorge Olivari was dismissed on motion by the district attorney, but the remaining six defendants were either convicted after trial (Florio, Solomon and Adams) or pleaded guilty before trial (Fairweather, Gargiulo, DeNardo). They were sentenced to varying jail terms and fines ranging from $1,000 to $5,000.

DISCUSSION

Brink's maintains that its motion for judgment n.o.v. on the punitive damages award should have been granted because, first, the City's claim was essentially one for breach of contract, a claim for which punitive damages are unavailable under New York law and, second, the evidence demonstrated only ordinary negligence and was therefore insufficient to support an award of punitive damages. Brink's also offers several reasons why a new trial should have been granted. At the most general level, Brink's argues that the jury's verdict against it was "excessive" and a result of "passion and prejudice." Brink's contends that the passion and prejudice was a direct result of the introduction of evidence as to its wealth and that of its corporate parent, the City's insistence on calling certain former Brink's employees that the City knew would refuse to testify on Fifth Amendment grounds, and expert testimony as to the City's losses that was so misleading as to be inadmissible. Also challenged is the jury's finding that the City shares no part of the blame for the thefts. Finally, Brink's argues that Judge Weinfeld's charge failed to track both a contractual provision limiting Brink's liability to the City and New York law limiting an employer's duty to supervise its employees. Three of the third-party defendants, Olivari, Hernandez, and Rodriguez, also argue that Judge Weinfeld erred in denying the motion for judgment n.o.v. or a new trial. We will consider each of the alleged errors in turn.

A. *Punitive Damages.* In *Garrity v. Lyle Stuart, Inc.*, 40 N.Y.2d 354, 358, 353 N.E.2d 793, 795, 386 N.Y.S.2d 831, 833 (1976), the New York Court of Appeals noted: "It has always been held that punitive damages are not available for mere breach of contract, for in such a case only a private wrong, and not a public right, is involved." (Citations omitted.) *See also Durham Industries, Inc. v. North River Insurance Co.*, 673 F.2d 37, 41 (2d Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 61, 74 L.Ed.2d 64 (1982). This is true even if the breach results from a deliberate breach of good faith, *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publishing Co.*, 33 A.D.2d 766, 767, 306 N.Y.S.2d 599, 601 (App. Div.1969) (mem.), *aff'd,* 30 N.Y.2d 34, 281 N.E.2d 142, 330 N.Y.S.2d 329, *cert. denied,* 409 U.S. 875, 93 S.Ct. 125, 34 L.Ed.2d 128 (1972). Brink's argument on appeal is based primarily on a sentence drawn from the district court's opinion to the effect that "[c]onceptually, the central core of the City's claims derives from a contract." 546 F.Supp. at 413. But we agree with the district court that, "in addition to its claim for negligent breach of contract, the City asserted a separate and independent cause of action for common law negligence." *Id.* Thus, although the "two claims were inter-

laced with one another and essentially rested upon the same conduct," *id.,* New York law does not preclude the award of punitive damages where conduct that gives rise to a contract action is also tortious. The City's theory of the case—that Brink's was negligent in failing to exercise reasonable care in hiring and supervising its employees, some of whom it knew or should have known were stealing—is certainly not a novel negligence claim. *See* Restatement (Second) of Torts § 302B (1965) (examples A & D); *McGuire v. Arizona Protection Agency,* 125 Ariz. 380, 609 P.2d 1080, 1081–84 (Ct.App.1980).

Brink's nevertheless argues that the City has simply sued in tort where the underlying duty breached was contractual. It refers to our own *Contemporary Mission, Inc. v. Bonded Mailings, Inc.,* 671 F.2d 81, 85 (2d Cir.1982), where the court stated that "[i]f the only interest involved, however, is holding a party to a promise, a plaintiff will not be permitted to transform the contract claim into one for tort." In neither *Contemporary Mission* or another case cited by Brink's, *Koufakis v. Carvel,* 425 F.2d 892 (2d Cir.1970), however, did the defendant commit any tort. Here, the jury found that the City proved common law negligence by one contracting party causing injury to the other. *Cf. Hargrave v. Oki Nursery, Inc.,* 636 F.2d 897, 899 (2d Cir.1980) (fraud inducing a contract creates legal relations separate and distinct from those arising under the contract and constitutes a separate tort). A tort by a defaulting promisor is no less a tort.

█ Even if we cannot take, e.g., *Reinah Development Corp. v. Kaaterskill Hotel Corp.,* 86 A.D.2d 50, 54, 448 N.Y.S.2d 686, 688–89 (App.Div.1982), *rev'd,* 59 N.Y.2d 482, 465 N.Y.S.2d 910, 452 N.E.2d 1238 (1983) (in case involving fraud within contractual relation, award of punitive damages not permitted absent proof that act was malicious, vindictive, or wanton and reckless), as being the New York law that we are required to follow, we believe that Brink's is precluded from raising the legal availability of punitive damages on this appeal in any event, when throughout the case Brink's accepted the view that this was a negligence case. Brink's challenged the charge, to be sure, but only on the ground that there was insufficient evidence to justify submission of the punitive damage issue to the jury, a matter we discuss below. It was certainly not plain error to submit the punitive damages claim to the jury under New York law and Brink's is therefore barred under Fed. R.Civ.P. 51 from pursuing this issue on appeal.

█ Turning to the question of evidentiary support for the award of punitive damages, the test, as we stated in *Doralee Estates, Inc. v. Cities Service Oil Co.,* 569 F.2d 716, 722 (2d Cir.1977), is whether "the continuing tortious conduct has been brought home to the consciousness of relatively important managerial personnel with authority to make a decision for the corporation that would have prevented the damage." Our review of the evidence bearing on Brink's handling of various incidents implicating security concerns during the course of the contract leaves us with little doubt that the evidence was more than sufficient to support the award under *Doralee Estates.* Indeed, the evidence—some of which we summarize below—indicates not only that "relatively important managerial personnel" had reason to suspect specific employees of theft but also that these officials did not even follow what their own testimony indicated was established Brink's procedure for dealing with security or rules violations, procedures that might well "have prevented the damage" suffered here.[3]

---

**3.** For example, the Brink's Personnel Policies Manual states that:

  C. *Investigation of Alleged Violations or Misconduct:* In the event a rule violation or misconduct of an employee is reported to you, it is your responsibility to investigate the incident to determine if a violation or misconduct did occur and, if it did, to gauge its seriousness.

  1. *Be Thorough and Objective:* .... Be thorough and methodical in your considerations. If you conduct a skimpy investigation, you may leave facts that are important to the case undiscovered.

For example, Mr. Mattia Mazza, a Brink's regional vice president, testified that Brink's policy regarding allegations of misconduct or a violation of security rules was to question the employee involved in order to get his or her side of the story. However, in this case the practice was disregarded; the employees about whom Mr. Mazza received information of involvement in theft of parking meter revenue were never interviewed. Although he had information that three Brink's employees were involved in "internal theft" while working on the parking meter contract and that "the driver whose identity is unknown would rendezvous with one or all of [these] employees at which time the money would be stolen," two of the employees in question continued to collect meter revenues even though Mazza had been informed that they were suspected of stealing from parking meters during their employment by Wells Fargo, Brink's predecessor on the contract. Mazza had also been informed by Brink's parking meter supervisor, William Donovan, a third-party defendant found not liable here, that a Brink's collector named Garcia had placed a coin box underneath his jacket and emptied the coins into his pocket. But Mazza did not interview Garcia, initiate any disciplinary proceedings, or order polygraph tests.

Other evidence of "knowledge and inaction on the part of responsible management officials," *Doralee Estates,* 569 F.2d at 722, was introduced from which the jury could

have concluded that Brink's, for all intents and purposes "ratified or fostered the acts complained of." *Williams v. City of New York,* 508 F.2d 356, 361 (2d Cir.1974). For example, Edward Lenehan, vice president of Brink's security division, testified that he was unaware of any obligation on Mazza's part to inform him or his security staff of rules violations by the collectors. He also testified that he did not view the theft of a coin box as a security incident, although such a minor theft would constitute a security incident if it occurred in connection with armored truck operations. Lenehan's surveillance of one collector uncovered that the driver returned three times to his residence during the course of one shift in a Brink's collection van, but Lenehan did not have his notes typed or a report prepared until some nine months later. The collector was never questioned. And after receiving a report from a "confidential source" that another collector was stealing coins, Lenehan ordered surveillance—but the operation lasted only four days and the collector was never observed during the critical period between the last meter collection and arrival at the PMD. Under the basic test set forth in *Doralee Estates,* we think the evidence was sufficient to take the matter of punitive damages to the jury.[4]

**B.** *Motion for a new trial.*

■■■ 1. *Evidence of Brink's and its corporate parent's assets.* Under New York law evidence of a defendant's wealth is

. . . .

5. *Employee's "Day in Court":* In any case of alleged misconduct or rule violation you must not rely solely upon your investigation. It is only fitting and proper that the accused employee be offered the opportunity to give his or her side of the story. The employee should be questioned thoroughly regarding this incident. If there are inconsistencies between what the employee tells you and what you developed in your investigation, you should check those inconsistencies out carefully . . . . . The employee may also be able to offer an explanation for his or her actions because of mitigating circumstances. If such circumstances are present, you should also consider these in determining your disciplinary action.

Brink's stresses that these were "not . . . mandatory rules, but *guidelines* for employee discipline." Reply Brief at 9 (emphasis in original). As such, of course, they were properly considered by the jury as bearing on whether Brink's exercised reasonable care in investigating reports of employee wrongdoing.

4. The jury was instructed that it had to find by "clear and convincing evidence" that Brink's conduct amounted to gross negligence tantamount to "willful, wanton and reckless" conduct. On the basis of the evidence summarized above, we cannot say either that there was a complete absence of probative evidence to support the verdict or that no reasonable and fairminded jury could arrive at this verdict. *Unijax, Inc. v. Champion International, Inc.,* 683 F.2d 678, 684 (2d Cir.1982).

admissible on the issue of the amount of punitive damages. *See Fury Imports, Inc. v. Shakespeare Co.,* 554 F.2d 1376, 1389 (5th Cir.1977), *cert. denied,* 450 U.S. 921, 101 S.Ct. 1369, 67 L.Ed.2d 349 (1981); *Rupert v. Sellers,* 48 A.D.2d 265, 268–73, 368 N.Y.S.2d 904, 909–13 (App.Div.1975). *Rupert,* however, alludes to privacy considerations on the one hand, and the ease with which a plausible claim for punitive damage may be made on the other, in pointing out that a rule permitting unlimited examination before trial of a defendant as to his wealth "could have unfortunate results" in terms of exerting pressure to compromise. 48 A.D.2d at 271, 368 N.Y.S.2d at 911. The *Rupert* court therefore prudently adopted the New Jersey rule that, as a "procedural principle," evidence of a defendant's wealth cannot be brought out at trial unless and until the jury has brought in a special verdict that the plaintiff is entitled to punitive damages. *Id.* at 272, 368 N.Y.S.2d at 912. But Brink's never suggested to the trial court that the *Rupert* practice should be followed; its argument on appeal therefore amounts to a claim that the trial court should have sua sponte ordered a bifurcated trial. Brink's had ample notice from the time the City filed its counterclaim that punitive damages were sought, but bifurcation was never requested. We agree with the Fifth Circuit's holding in *Fury Imports* that where the issue is not raised below, it will not be considered on appeal.[5] 554 F.2d at 1389.

2. *Assertion of Fifth Amendment privileges at trial by Brink's former employees.* Brink's argues that the trial court erred in ruling that the City could question past and present employees about their knowledge and participation in thefts and that their refusal to answer on Fifth Amendment grounds was competent and admissible evidence. As Judge Weinfeld anticipated, present and former Brink's employees in fact declined to answer questions concerning the pilferage of coin boxes. The question assumes added significance because the City relied in summation upon the Fifth Amendment assertions as circumstantial evidence in support of its claim against Brink's. Moreover, in its charge, the court mentioned this reliance and pointed out to the jury that a "witness ha[s] a constitutional right to decline to answer on the ground that it may tend to incriminate him. However, you may, but need not, infer by such refusal that the answers would have been adverse to the witness' interest."

Brink's relies heavily upon *United States v. 5 Cases, More or Less, Containing "Figlia Mia Brand",* 179 F.2d 519 (2d Cir.1950), where, in an action to condemn olive oil because shark liver squalene had been added to it, a witness called by the Government claimed his privilege against self-incrimination when asked whether he had sold any squalene to the claimant. The court cited J. Wigmore, Evidence § 2268 (3d ed.), where that great authority stated: " 'The privilege is merely an *option of refusal,* not a prohibition of inquiry' and 'it is universally conceded that the question may be put to the *witness on the stand*' " (emphases in original), but nevertheless held that "we are not prepared to say that it would not be ground for reversal if the party who called a witness connected with a challenged transaction knew, or had reasonable cause to know, before putting the witness on the stand that he would claim his privilege." 179 F.2d at 523. The court found no error, however, because, first, there was no proof that the Government knew or had reasonable cause to know that the witness would claim a privilege and, second, even though the witness continued to assert the privilege, "the claimant allowed the questions to

---

5. Brink's also complains that evidence of the wealth of its corporate parent, the Pittston Company, was improperly received and referred to in summation, but this point was also not preserved. *Herman v. Hess Oil Virgin Islands Corp.,* 524 F.2d 767, 772 (3d Cir.1975). We therefore need not reach the question whether annual reports reflecting the income of a parent corporation are admissible for the purpose of assessing punitive damages against a subsidiary. *See Mihara v. Dean Witter & Co.,* 619 F.2d 814, 824 (9th Cir.1980) (annual reports of parent clearly relevant); *Palmer Coal & Rock Co. v. Gulf Oil Co.-U.S.,* 524 F.2d 884, 887 (10th Cir.1975), *cert. denied,* 424 U.S. 969, 96 S.Ct. 1466, 47 L.Ed.2d 736 (1976).

go on without a whisper of objection." *Id.* Here, of course, Brink's objected strenuously. Brink's also points out that the City had good reason to believe that these witnesses would assert the privilege.

■ The propriety of calling witnesses who intend to assert a Fifth Amendment privilege not to testify poses a difficult question, and one upon which the courts and commentators have taken different positions. Our inquiry starts with the Federal Rules of Evidence, and of course it will be recalled that, of the rules promulgated by the Supreme Court, Rules 501–513 were not adopted by Congress although Rule 501 was amended by the Congress and became a substitute for all of the court's promulgated privilege rules. *See generally* 2 J. Weinstein & M. Berger, Weinstein's Evidence, 501[01] (1982). Rule 501 thus left the law of privilege in its then current posture, to be developed by the judiciary utilizing "the principles of the common law ... in the light of reason and experience." Fed.R. Evid. 501. We are reminded by *Trammel v. United States,* 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980), that in rejecting the proposed rules and enacting Rule 501 "Congress manifested an affirmative intention not to freeze the law of privilege. Its purpose rather was to 'provide the courts with the flexibility to develop rules of privilege on a case-by-case basis,' ... and to leave the door open to change." *Id.* at 47, 100 S.Ct. at 911 (citations omitted). Nevertheless, we can at least look at the standards proposed to the Supreme Court by the Advisory Committee on the Federal Rules of Evidence, and adopted by the Court, as reflective of reason and experience and as "a convenient and useful starting point for examining questions of privilege." 2 J. Weinstein & M. Berger, *supra,* at 501–26.

Supreme Court Standard 513(a) was to the effect that "[t]he claim of a privilege ... is not a proper subject of comment by judge or counsel. No inference may be drawn therefrom." *Reprinted in id.* at 513–1. The Advisory Committee's notes relied on *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), a criminal case, and "the weight of authority" as support, 2 J. Weinstein & M. Berger, *supra,* at 513–2, although it noted the variance between Rule 233 of the Model Code of Evidence and Uniform Rule of Evidence 39. *Id.* at 513–3. Standard 513(b) endeavored to protect privilege claims by providing that in jury cases "proceedings shall be conducted, to the extent practicable, so as to facilitate the making of claims of privilege *without the knowledge of the jury.*" (Emphasis added.) *Id.* at 513–1. And Standard 513(c) required, upon request, a jury instruction against drawing an inference from assertion of the privilege. *Id.* Thus the whole aim of the proposed rule, without being absolute, was to strengthen the value of the privilege.

Despite the reliance on *Griffin,* the Supreme Court Standard made no distinction between criminal and civil cases or between claims of privilege asserted by a party and claims of privilege asserted by a nonparty witness. Of the states that have adopted similar rules, we note that Maine distinguishes between claims of privilege in criminal cases—in which comment upon or inference from such claim is not permitted—and in civil cases—where comment or inference is permitted as to the claim of privilege by a party but not by a nonparty witness. *See id.* at 513–8. *See also* 8 J. Wigmore, Evidence § 2272, at 437 (McNaughton rev. ed. 1961). This case, of course, is further complicated by the fact that the witnesses involved here are parties vis-a-vis Brink's third-party claim against them and third-party witnesses vis-a-vis the City's claim against Brink's. Thus Brink's is to a certain extent torn because, *qua* third party plaintiff, it would like to have the inference of guilt drawn while, *qua* original party defendant on the counterclaim, it would prefer, of course, not to have the witnesses called at all.

Brink's conflicting interests in this case nicely illustrate the difficulty, and perhaps the undesirability, of a bright line rule against drawing inferences from a failure to testify in the context of civil proceedings. In criminal proceedings the cleavage of in-

terests is clear, and evidentiary rules that tend to make the assertion of a privilege more costly are disfavored because they discount a defendant's constitutional rights. In civil matters, however, there is generally no constitutional interest underlying a particular claim of privilege; the calculus of interests is therefore all the more difficult. Thus, although we are cognizant of the interests Supreme Court Standard 513 sought to secure, we find support for a distinction between civil and criminal proceedings in a Supreme Court decision rendered after Standard 513 was recommended to Congress by the Court. In the case of *Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976), the Court held that a prison disciplinary hearing is a civil proceeding and that adverse inferences could be drawn against an inmate who declined to testify. The Court pointed to "the prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties to *civil* actions when they refuse to testify in response to probative evidence offered against them." 425 U.S. at 318, 96 S.Ct. at 1558 (emphasis added).[6] The Court also pointed out its consistent recognition that "in proper circumstances silence in the face of accusation is a relevant fact not barred from evidence by the Due Process Clause." *Id.* at 319, 96 S.Ct. at 1558 (citing cases).

Previous decisions of this court lend logical support to different treatment of claims of privilege in criminal and civil cases. For example, in *United States v. Tomaiolo,* 249 F.2d 683, 690–92 (2d Cir.1957), we held that a witness's invocation of his Fifth Amendment privilege was not inconsistent with his later exculpatory testimony at trial and thus that the prosecution should not have been allowed to introduce evidence of the invocation on cross-examination. Our decision clearly rested on circumstances peculiar to the criminal context. Citing *Grunewald v. United States,* 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), we emphasized that the conditions of grand jury appearances (e.g., compelled testimony, absence of counsel, no opportunity for cross-examination, the secretive nature of the proceedings) are particularly likely to lead innocent witnesses to invoke the privilege. Similarly, in *United States v. Maloney,* 262 F.2d 535, 537 (2d Cir.1959), we found that "the interest of the accused should prevail over that of the prosecution," and held that the judge's failure to instruct the jury that "they must not use the refusal as evidence of what the answer would have been" constituted reversible error. *Id.* at 538. Thus, although we have not previously determined whether civil and criminal cases should be distinguished in treating claims of privilege, our earlier decisions limiting the inferential use of such claims were rooted in factors unique to the criminal context and accordingly are consistent with our holding today.[7]

One commentator, pointing out that ample sanctions against *plaintiffs* who exercise their privilege have always been granted, notes that it is unfair to prevent a jury from drawing inferences against *defendants* when they or their employees exercise a privilege. Heidt, The Conjurer's Circle:

---

**6.** Justice Brennan, joined by Justice Marshall, dissented in *Baxter,* criticizing the majority's view as permitting governmental coercion of disclosures through threats of noncriminal sanctions. But it was preserving the system of *criminal* justice by preventing the Government from circumventing the purpose of privileges by abuse of its powers with which the dissent was primarily concerned. 425 U.S. at 334–35, 96 S.Ct. at 1565–66. Thus the dissent drew a contrast between criminal proceedings and the case of "a civil suit involving only private parties" where "no party brings to the battle the awesome powers of the government," *id.* at 335, 96 S.Ct. at 1566, and went on to state that "therefore to permit an adverse inference to be

drawn from exercise of the privilege [in a civil case] does not implicate the policy considerations underlying the privilege." *Id.*

**7.** The dissent cites *Maloney* and *Tomaiolo* for the proposition that the probative value of a refusal to testify is outweighed by its prejudicial impact. This reading of the cases is surely too broad, however. As noted above, the decisions in both *Maloney* and *Tomaiolo* rested heavily on the circumstances of criminal prosecutions and thus do not support a rule against the inferential use of claims of privilege in civil cases.

The Fifth Amendment Privilege in Civil Cases, 91 Yale L.J. 1062, 1087–88, 1107–35 (1982). At the very least, Professor Heidt suggests, the plaintiff's attorney should be allowed to inform the factfinder of the invocation of privilege without having to call the invoker to the stand. He also urges that claims of privilege made while the employee is still working for the defendant at the time of claim be adopted as a vicarious statement of the defendant employer if the question that triggered the claim related to the employee's work. *Id.* at 1119–22. The fact that the invokers of the privilege are no longer employees of the defendant does not necessarily bar admittance of their refusals to testify as vicarious admissions of their former employer, Professor Heidt argues, *id.* at 1119–20 n. 214, and we see no reason for a different result. Overall, we are inclined to agree with Judge Weinfeld that the employees' claims of privilege were admissible and competent evidence under the circumstances of this case, given the fact there is no constitutional mandate, *Baxter v. Palmigiano,* 425 U.S. at 318, 96 S.Ct. at 1558, against their admission.

But our inquiry is not ended. We still must determine whether the trial court was correct in concluding that the probative value of the evidence was not "substantially outweighed by the danger of unfair prejudice" under Fed.R.Evid. 403. This balancing test, left largely to the discretion of the trial judge, *United States v. Robinson,* 560 F.2d 507, 514–15 (2d Cir.1977), *cert. denied,* 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978); Friendly, Indiscretion About Discretion, 31 Emory L.J. 747, 780–83 (1982), raises interesting questions as applied in this case. In the first place, the assertion of the privilege by the employees benefits Brink's, presumably, on its third-party claim just as it benefits the City against Brink's on the former's counterclaim. To be sure, that assertion is prejudicial in the sense that it gives support to the City's position against Brink's, just as it is prejudicial against the individual third-party defendants on Brink's claim against them. As pointed out by Judge Weinfeld, however, the evidence is not prejudicial in the sense of being inflam-

matory, 539 F.Supp. at 1141, even though it is prejudicial in the sense of giving support to a party's position, i.e., it is "damning." *United States v. Cirillo,* 468 F.2d 1233, 1240 (2d Cir.1972), *cert. denied,* 410 U.S. 989, 93 S.Ct. 1501, 36 L.Ed.2d 188 (1973); *see also United States v. Danzey,* 594 F.2d 905, 910–15 (2d Cir.), *cert. denied,* 441 U.S. 951, 99 S.Ct. 2179, 60 L.Ed.2d 1056 (1979).

We agree with Judge Weinfeld's determination that, given the probative value of this evidence to the City's case—the City was, after all, defending against an action originally brought by Brink's—its admission was not unduly prejudicial. The key issue here was the extent of the thefts because it is only from this evidence that the jury could draw an inference regarding Brink's knowledge or negligence. To be sure, the convictions of the witnesses had been admitted so that, to some extent, having them exercise their privilege was a bit redundant, but this of course goes to lessen the total prejudicial effect of their refusal to testify. And despite the fact that the City had good reason to believe that the witnesses would assert their privilege when called, there was always the possibility that one of the defendants, after pleading guilty or being convicted, might "come clean" on the witness stand as a matter of conscience. *See* 539 F.Supp. at 1142.

■ 3. *Admission of expert testimony.* Relying on the line of cases perhaps best typified by *Herman Schwabe, Inc. v. United Shoe Machinery Corp.,* 297 F.2d 906, 912 (2d Cir.), *cert. denied,* 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962), Brink's claims that the court below erroneously admitted expert testimony comparing parking meter revenues turned over by Brink's with revenues turned over in a later period by Brink's successor under the contract. The testimony, accompanied by tables and charts, compared the $17,136,640 received during a ten-month period under Brink's with the $18,116,998 received in the same ten-month period a year later under Brink's successor, CDC. The difference of $980,358, Brink's points out, is very close to the verdict of $1 million in compensatory damages.

Brink's claims that the comparison was invalid because the time periods were not comparable and argues that the award must therefore be reversed.

In support of this contention Brink's cites a raft of factors that it claims might well have accounted for the difference in revenues between the two periods. Specifically, Brink's points to gasoline rationing during the Brink's period and a PATH strike during the CDC period as factors that might have decreased revenues during the Brink's period and boosted them during the CDC period. Brink's also argues that the City's experts failed to take into account other factors, such as relocation of meters to high-revenue, low-vandalism areas, differences in the number of defective meters, and meter suspension and snow emergency days that could have affected revenue. Finally, a Brink's expert used some of the same data relied on by the City to generate evidence of a trend of increasing revenues for the two periods. In sum, Brink's argument is that, as in *Schwabe,* the court erroneously permitted the jury to consider "an array of figures conveying a delusive impression of exactness in an area where a jury's common sense is less available than usual to protect it," 297 F.2d at 912, and that the City's expert testimony was too speculative to support the award. *See, e.g., Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931); *Marx & Co. v. Diners' Club, Inc.,* 550 F.2d 505, 511 (2d Cir.), *cert. denied,* 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977); *Coleman Motor Co. v. Chrysler Corp.,* 525 F.2d 1338, 1352 (3d Cir.1975).

Of course there is another line of authority—exemplified by *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946)—that runs back to *Eastman Kodak Co. v. Southern Photo Materials Co.,* 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684

(1927), and includes *Story Parchment*'s classic:

In such case [where the defendant's act prevents more precise proof], while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise.

*Story Parchment,* 282 U.S. at 563, 51 S.Ct. at 250.

As this court stated in *Schwabe:*

There is no bright line that divides evidence worthy of consideration by a jury, although subject to heavy counterattack, from evidence that is not. Especially because of the guaranty of the Seventh Amendment, a federal court must be exceedingly careful not to set the threshold to the jury room too high.

297 F.2d at 912. The question is whether "the leap required to derive any rational conclusion from the expert's data" is "too great to allow a jury to take." *Id.* Each case must be examined on its own facts to determine whether, when, as here, revenues for different periods of time are compared, the periods and the factors underlying them are reasonably comparable. The City's expert gave his judgment that "differences in various nonculpable factors had been adequately accounted for and that conditions in the comparison periods were substantially the same." 546 F.Supp. at 410. His conclusion was that Brink's had collected in the earlier period some $1,382,000 less than the successor company under a per meter day concept, or $980,000 by comparing actual collections under Brink's to actual collections by CDC, with a 10% plus or minus margin for error.[8] Here, Judge Weinfeld

---

**8.** The City's statistical expert testified on cross-examination that:

The purpose of [statistical analysis] is: what is the most reasonable estimate of the difference and what you can most reasonably

attribute the difference to? That's the best you can do.

. . . .

In terms of the statistical model, the standard error that I gave—the difference of 1.4

carefully instructed the jury that it was not to guess or speculate, but was to make a fair and reasonable estimate from the evidence presented. He also directed the jury's attention to the conflict between experts, emphasizing their differing opinions particularly on the issue of the comparability of the time periods in question, and gave the usual instructions as to evaluation of expert testimony and the jury's right to accept or reject it.

Brink's vigorously cross-examined both of the City's principal witnesses, and introduced its own evidence and statistical handiwork to buttress its claims. That the jury rejected Brink's approach and accepted the City's is clear. We cannot say on this record that there was no basis for the City's assumptions that certain factors would have a de minimis effect on revenue and that other factors should not be included because their effects were uncertain. Unlike *Schwabe* and the other antitrust cases cited by Brink's, this is not a case where the jury inferred injury simply from the evidence as to damages. Here there was evidence independent of the City's experts' testimony establishing that systematic theft had occurred over a long period of time. Brink's contention that the City had to quantify every "nonculpable" factor that might have affected revenue is seriously flawed by the fact that Brink's itself cannot demonstrate with certainty that there is, or was, a causal relationship between these factors and revenues. Absent such a demonstration, however, Brink's is arguing that if it is able to mount a tenable challenge to the City's assumptions regarding damages, the jury award was necessarily a result of rampant speculation. This is inconsistent with both the jury's role as a factfinder and the principle that a wrongdoer cannot avoid liability because a plaintiff is unable to demonstrate the extent of injury with "exactness and precision." *Story Parchment,* 282 U.S. at 563, 51 S.Ct. at 250. On the whole, we are convinced that the damage award falls on the *Bigelow* rather than the *Schwabe*

side. *See also Litton Systems, Inc. v. American Telephone and Telegraph Co.,* 700 F.2d 785, 822–26 (2d Cir.1983).

■ *4. Excessiveness of the verdict.* Brink's argues that as a result of being [e]xposed to evidence of massive wealth . . . presented with a stream of witnesses called by the City for the sole purpose of asserting their Fifth Amendment privilege, and misled by expert testimony having the appearance of precision . . . the jury arrived at a verdict awarding excessive compensatory and punitive damages. In this context, the jury's verdict could not have failed to be the result of passion and prejudice.

Our discussion and rejection, *supra,* of each of these arguments undercuts the contention that the jury's verdict was in any way "tainted." Nevertheless, Brink's argues that the jury's passion and prejudice is demonstrated by the large disparity between the $1 million compensatory verdict awarded the City and the $50,000 verdict awarded Brink's against its former employees.

We note at the outset that there is no legal requirement that the verdicts here be comparable. That the jury did not award as much as it might have against the former employees does not establish that the verdict against Brink's was not "based upon the evidence and the law." *Malm v. United States Lines Co.,* 269 F.Supp. 731, 731–32 (S.D.N.Y.), *aff'd per curiam,* 378 F.2d 941 (2d Cir.1967). *See also Jayne v. Mason & Dixon Lines, Inc.,* 124 F.2d 317, 319 (2d Cir.1941). Contrary to Brink's argument, we see no reason why the jury could not infer that there were collectors other than those sued by Brink's that were involved in the thefts. Certainly it was not the City's obligation to establish or negate that possibility. The City's success in its action against Brink's is independent of Brink's success in its suit against its former employees. The cases cited by Brink's involv-

million is plus or minus the standard error of 140,000, that standard error, that uncertainty factor of 140,000 is precisely what the statis-

tician does to qualify . . . variations that are not otherwise explained.

ing joint tortfeasors are therefore inapplicable.

Nor are we persuaded that Judge Weinfeld erred in granting remittitur rather than a new trial. In essence, Brink's argument is that if remittitur was appropriate, a new trial should have been granted. We agree with Judge Weinfeld's conclusion that retrial of a case that had "extended over a period of almost four weeks with a record of more than 3,000 pages" would have been unwise, and that the "interests of the parties and justice" were best served by remittitur. 546 F.Supp. at 415. We decline to second-guess either this conclusion or his determination that the punitive damages should be reduced to $1.5 million.

■■■ 5. *The verdict of no comparative fault on the City's part.* Brink's argument that the jury's failure to assign any percentage of the fault for missing revenue to the City's own negligence was contrary to the weight of the evidence is based on evidence to the effect that (1) keys to the outside locks on the canisters were not issued to Brink's; (2) the entire series of outside locks on the canisters was changed toward the end of 1979; (3) two sets of keys were found in the automobiles of Brink's collectors Florio and Solomon after their arrest; (4) a City detective testified that his examination showed that these keys would open "each and every lock affixed to the canisters containing parking meter revenues"; and (5) a report by a City employee indicated that security over the keys in the spring of 1979 was inadequate because canister keys were kept in PMD offices in an open safe accessible to many PMD employees and City employees had been seen leaving the PMD through an unauthorized back door. Thus, the argument is that the City was itself negligent in terms of its security as to keys to the outside canister locks.

We believe that this was a matter purely for the jury to determine on the basis of the evidence. We do not know how the Brink's

employees came into possession of master keys, whether by direct theft—although the Brink's people apparently did not have access to the second floor at 42 Franklin Street—or by collusion with a corrupt City employee or otherwise. We do know that the collector Solomon was specifically asked on direct testimony by City counsel whether he ever came into possession of these keys and whether he used them to open the canisters and take parking meter revenues and that in each case he asserted his privilege under the Fifth Amendment. Brink's counsel asked the same questions of witness Florio with the same result. From these answers Brink's could perfectly well argue that the employees came into possession of keys enabling them to open the canisters and take the parking meter revenues, that they had to get them somewhere, and that the only inference that could be drawn is that they got them through lax City procedures. If these arguments were not made, Brink's has only itself to blame; if these arguments were made and the jury rejected them, we can only assume that the matter was too speculative for the jury to have resolved in Brink's favor. In any event we certainly cannot say that the verdict was, as Brink's claims, contrary to the manifest weight of the evidence.[9]

6. *Limitation of damages under the contract.* Brink's contract with the City included a liability limitation. The court quoted verbatim in its charge to the jury section 6(c) of the contract which provided that

[t]he contractor's liability for any loss of revenue of the City for which it shall be found to be liable hereunder shall be limited to an amount determined by use of the average of daily collections from the meters from which said revenues shall have been collected but in no event an amount in excess of the $125,000 per work day during the period of the loss.

---

**9.** We reject Brink's argument that the City was negligent in failing to inform Brink's of the investigation and "salting" in November of 1979. This information might well have leaked down to those involved in the theft; the City was not required to jeopardize its investigation to avoid a claim that it failed to take a "last clear chance" to avoid injury.

Brink's claim is that this part of the charge was "undercut" by the instruction that the jury was required to determine the amount of meter collections that were stolen and award that sum as compensatory damages. This error was compounded, Brink's argues, by the special verdict form which asked the jury to determine only "[w]hat is the amount of damages that Brink's caused the City to sustain?"

■ Brink's objection is difficult to fathom given the fact that Judge Weinfeld, after reading section 6(c), went on to instruct the jury that "[u]nder the evidence presented, I suggest, but it is up to you to decide, that a single day's damage cannot exceed $85,000, not the $125,000 specified in that clause." This qualification was based on evidence that Brink's daily collections did not exceed $85,000; thus the court's charge actually served to cap the maximum that could be awarded per day at a *lower* amount than that established by the contract, something that could only benefit Brink's. We read Section 6(c)'s clause, "an amount determined by use of the average of daily collections from the meters from which the revenues shall have been collected," to exclude any amounts collected by City personnel during the period. Again this limited the private contractor's damages by reference to its own daily collections, rather than to total average daily collections. We reject Brink's rather tortured interpretation of 6(c) embodied in its request that the court charge the jury to the effect that it should (1) compare average daily collections from a specific area with the monies actually received from Brink's from that area on the specific day a theft occurred in that area and (2) limit Brink's liability to the amount by which the actual collections that day fell short of average daily collections. There is simply nothing in the clause to support this analysis.[10]

■ 7. *Duty to investigate employees.* Brink's challenges the following instruction as being contrary to applicable New York law:

> Brink's, as the employer, was under a duty to exercise reasonable care, once an employee was hired with respect to his supervision, to determine whether he remains competent and trustworthy to carry out his assigned duties without danger of damage or injury to others, and if he is not, or has reasonably been found to pose such a danger to remove him from that employment.

The thrust of this instruction—that once facts *do* come to the employer's attention which indicate that its trust has been misplaced there is a duty to take action—answers the Brink's contention that it might have been held liable solely for its failure to conduct an ongoing investigation of all of its employees. Under New York law an employer is required to exercise

> such an oversight and supervision of . . . servants, that if they afterwards become habitually or notoriously incompetent or unfit, from carelessness or bad habits, to perform their duties, this incompetency, if long continued, should be discovered and guarded against.

*Whittaker v. Delaware and Hudson Canal Co.,* 126 N.Y. 544, 549, 27 N.E. 1042, 1042 (1891). Judge Weinfeld's charge was a proper statement of New York law.

8. *Cross appeal of third-party defendants.* On their cross-appeal third-party defendants Olivari, Hernandez, and Rodriguez make the frivolous argument that Brink's in effect assented to their conduct and should therefore be estopped from maintaining a third-party action. They too point to the inconsistency between the $50,000 and $1 million verdicts, and argue that this reflects the jury's view that Brink's "indulged" their activities. We believe that

**10.** Brink's also excepted to the trial court's failure to instruct the jury that it could award Brink's punitive damages against the individual collectors "in the amount they actually took and/or any punitive damages resulting therefrom." The charge was properly rejected. The punitive damages against Brink's were based on Brink's "wanton" violation of its own duty to supervise its employees. Liability over against the third-party defendants would have softened the sting and thereby defeated the purpose of punitive damages.

this argument does not merit extended discussion.

Also not needing discussion is the argument that liability against these individuals was based on innuendo. There was direct testimony that Hernandez offered a fellow employee "some of the action"; appellants Olivari and Hernandez were part of a Brink's crew found by the City's covert "salting" operation to have failed to return salted coins on November 27, 1979; Hernandez was part of a crew similarly implicated on January 22, 1980; Olivari was observed exiting a Brink's truck and placing a heavy bag into Gargiulo's truck and later receiving a bag from Gargiulo; Hernandez and Rodriguez were seen taking a bag of coins into an apartment house.

Judgments affirmed.

WINTER, Circuit Judge, dissenting:

I dissent. My misgivings concern the ruling permitting the systematic interrogation of witnesses on direct examination by counsel who knows they will assert the privilege against self-incrimination. This holding allows juries to draw prejudicial inferences from leading questions put to witnesses, denies parties the right to cross-examine, and is an invitation to sharp practice.

The assertion of the privilege by the five witnesses in the instant case was hardly unexpected, and the direct examination did not cease once it became clear that they would not testify in the conventional sense. Indeed, the City was altogether uninterested in posing questions that elicited testimonial answers. Direct examination of two of the five witnesses resulted in nothing but a statement that each was testifying under subpoena, followed by the assertion of the privilege in response to seventeen and thirteen questions, respectively. The examination of the other three did not differ in substance.

The majority's suggestion that these witnesses might have "come clean" on the stand is a transparent make-weight. Not only did the questioning persist well after the witnesses' intentions not to testify were apparent to all, but a voir dire examination outside the presence of the jury could easily have established those intentions.

I

Viewing the issue as an open question—albeit the majority's view is not only unprecedented but also contrary to every precedent, including decisions of this court, see II *infra*—the prejudicial impact of allowing juries to draw inferences against parties from assertions of the privilege by witnesses clearly outweighs any probative value. Fed.R.Evid. 403.

First, the supposed probative value is derived entirely from the questions put by counsel. Consider the following examination of Mr. Gargiulo, a discharged employee of Brink's:

Q: Did you carry a brown satchel while you were working on the parking meter contract?

A: I respectfully must decline to answer that question pursuant to my rights under the Fifth Amendment of the Constitution of the United States.

Q: And it's a fact, is it not, that you used that satchel to place monies from the coin cannisters into the satchel to take for your own personal use during the period of the parking meter contract?

A: I respectfully must decline to answer that question pursuant to my rights under the Fifth Amendment of the Constitution of the United States.

Q: On March 5, 1980, do you recall throwing a handful of slugs into a trash can in a Blimpie's near 42 Franklin Street?

A: I respectfully must decline to answer that question pursuant to my rights under the Fifth Amendment of the Constitution of the United States.

\* \* \* \* \* \*

Q: Mr. Gargiulo, on March 28, 1980, did you accompany Brink's collector Trevor Fairweather to his home on 89th Street in Manhattan and bring a brown satchel containing parking

meter revenues up to his apartment with him?

A: I respectfully must decline to answer that question pursuant to my rights under the Fifth Amendment of the Constitution of the United States.

Obviously, the posing of fact-specific questions is designed to suggest to the jury that but for the privilege the answer in each case would have been "yes." However, since the privilege may be invoked as to any answer "which would furnish a link in the chain of evidence needed to prosecute the claimant," *Hoffman v. United States,* 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951), and "[t]o sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer ... or an explanation of why it cannot be answered might be dangerous," *id.* at 486–87, 71 S.Ct. at 818–19, assertion of the privilege in response to specific questions such as these quoted above is permissible whether the answer is "yes" or "absolutely not." Nevertheless, the self-evident purpose of such questioning is to suggest that the answer would be "yes." Otherwise, the questions would never be asked. This practice inevitably invites jurors to give evidentiary weight to questions rather than answers. Moreover, it leaves the examiner free, once having determined that the privilege will be invoked, to pose those questions which are most damaging to the adversary, safe from any contradiction by the witness no matter what the actual facts.[1]

Second, the adversary is effectively denied the right of cross-examination since the witness cannot even be made to explain why the privilege has been invoked, much less to contradict the intended inference. The best a cross-examiner can do to combat the interrogation quoted above, I suppose, is to provoke something like the following mindless exchange:

Q: You did not carry a brown satchel while you were working on the parking meter contract, did you?

A: I respectfully must decline to answer that question pursuant to my rights under the Fifth Amendment of the Constitution of the United States.

Q: And it is not a fact, is it, that you used a satchel to carry monies from the coin cannisters for your own personal use during the period of the parking meter contract, is it?

A: I respectfully must decline to answer that question pursuant to my rights under the Fifth Amendment of the Constitution of the United States.

Q: You do not recall, do you, throwing a handful of slugs into a trash can in a Blimpie's near 42 Franklin Street on March 5, 1980?

A: I respectfully must decline to answer that question pursuant to my rights under the Fifth Amendment of the Constitution of the United States.

\* \* \* \* \* \*

Q: Mr. Gargiulo, you did not accompany Brink's collector Trevor Fairweather to his home on 89th Street in Manhattan and bring a brown satchel containing parking meter revenues up to his apartment with him, on March 28, 1980, did you?

A: I respectfully must decline to answer that question pursuant to my rights under the Fifth Amendment of the Constitution of the United States.

The fundamental weakness of the "testimony" permitted by the majority is demonstrated by comparing it with analogous kinds of evidence which are clearly inadmissible under the Federal Rules. For example, had Gargiulo uttered the content of the direct examination to a friend prior to trial, his statements would have been inadmissible against Brink's for the truth of the matter asserted even if Gargiulo took the stand. Fed.R.Evid. 801(d)(1)(A). Yet evi-

---

1. Whether there is other evidence in the case to support the factual premises of the questions is irrelevant to my point since that evidence must stand on its own and is neither strengthened nor weakened by the kind of examination described above.

dence of such statements is more probative and subject to testing on cross-examination than the non-answers given in the instant case. There is a certain irony in today's decision since Rule 801(d) as originally proposed would have admitted such statements for their truth but was amended by Congress to exclude them at the urging of members of this Court. See H.Rep. No. 650, 93d Cong., 2d Sess. 13 (1973), reprinted in 1974 U.S.Code Cong. & Ad.News 7075, 7086–87, citing United States v. Cunningham, 446 F.2d 194 (2d Cir.), cert. denied, 404 U.S. 950, 92 S.Ct. 302, 30 L.Ed.2d 266 (1971).

Another analogy to the practice condoned by the majority is the hearsay exception for declarations against interest. Fed.R.Evid. 804(b)(3). Under that rule the declarant must make a "statement" with content sufficiently opposed to certain specific kinds of interests of the declarant that "a reasonable man in his position would not have made . . . unless he believed it to be true." Id. I strongly believe, indeed, I am utterly confident, that a statement by a declarant, "I would rather not get into that," would not be admissible under Rule 804(b)(3), although it is the essential equivalent of what happened in the instant case.

There can be little doubt that the tactic in question had a devastating effect on Brink's in this case.[2] First, it was relied upon heavily by the City to show Brink's liability. In his summation, counsel for the City repeatedly characterized use of the privilege as testimony, read to the jury extended passages of the transcript where the privilege was invoked in answer to fact-specific questions, and sarcastically referred to use of the privilege as the "explanation" given by the five witnesses of their conduct. In a telling portion of the summation, the attorney read a question put to such a witness, paused and noted for the jury's benefit, "Pretty specific question," before reading the answer, "I would like to assert my privilege under the Fifth Amendment on the grounds that it might incriminate me." Second, the effect of such questioning blunted one of Brink's strongest points, namely that city employees must have connived in the thefts and that the City's failure to supervise its employees was a cause of the losses suffered. Finally, the prejudicial impact is evident in the jury's verdict, which found the City blameless, awarded substantial compensatory damages against Brink's, and found punitive damages in an amount so shocking that the district court reduced it by 70%.

## II

So far as I can determine, the holding of the majority opinion establishes a rule utterly without precedent in American law. See Annot. 24 A.L.R.2d 895 (1952). It is directly inconsistent with our decisions in United States v. Maloney, 262 F.2d 535 (2d Cir.1959) and United States v. Tomaiolo, 249 F.2d 683 (2d Cir.1957). The majority's discussion of these cases borders on the flip and crosses over into the beside-the-point. In Maloney, which discusses favorably our decision in United States v. 5 Cases, More or Less, Containing "Figlia Mia Brand", 179 F.2d 519 (2d Cir.), cert. denied, 339 U.S. 963, 70 S.Ct. 997, 94 L.Ed. 1372 (1950), a civil proceeding, the pertinent passage from Judge Learned Hand's opinion reads:

[I]n [the prosecution's] summation it referred to [the witness'] refusal in a context that could only have been understood as arguing that, if he had not refused, his answer would have been in the affirmative. Such refusals have been uniformly held not to be a permissible basis for inferring what would have been the answer, although logically they are very persuasive. How to deal with them is another matter, not easy to decide; but it is clear, not only that the presumed answer has not the sanction of an oath,

2. Because the witnesses were third party defendants vis-a-vis Brink's, the majority argues that the inferences drawn from resort to the privilege were "presumably" as beneficial to Brink's as to the City. Since the City called the witnesses and read back their "testimony" in summation while Brink's strenuously objected, counsel seem not to agree. The jury also failed to notice the benefits to Brink's when it returned a $6 million verdict against it and found the individuals severally liable for $5,000 each.

but—what is even more important—that the accused cannot cross-examine. If they once do get before the jury, there arises, as we have said, a strong probability that they will be taken as evidentiary. 262 F.2d at 537. This analysis, I submit, is in no way limited to criminal proceedings. Instead of responding with a counter analysis, the majority merely quotes Judge Hand as saying, "the interest of the accused should prevail over that of the prosecution," a statement which does not support the majority's position and is lifted from the discussion of a wholly different point, namely whether in the particular case the jury might draw an adverse inference from the failure of the prosecution to call the witness. *Id.*

As for *Tomaiolo,* the majority limits its discussion to the fact that the witness's assertion of the privilege occurred before a grand jury, a point having absolutely nothing to do with whether that assertion of the privilege may be offered in a civil proceeding. Moreover, the pertinent conclusion in *Tomaiolo* was

> It thus seems to us that "in the particular circumstances of this case, the cross-examination should have been excluded because the probative value on the issue of * * * credibility was so negligible as to be far outweighed by its possible impermissible impact on the jury." *Grunewald v. United States,* 353 U.S. at page 420 [77 S.Ct. at page 982].

249 F.2d at 692. Again, the analysis is that the probative value of such interrogation is outweighed by its prejudicial impact, an analysis as applicable to civil as to criminal proceedings. Fed.R.Evid. 403.

The majority correctly states that *Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976), endorsed "the pre-vailing rule that the Fifth Amendment does not forbid adverse inferences against parties to a civil action when they refuse to testify in response to probative evidence offered against them." *Id.* at 318, 96 S.Ct. at 1558. However, the issue is not whether adverse inferences may be drawn against a *party* who asserts the fifth amendment in a civil action, but whether adverse inferences may be drawn against a party because a *witness* (whether or not another party) asserts the fifth amendment.

Whether because of imperatives of the adversary system or intuitive judgments about fairness, acts or statements of parties, when offered by their adversaries, are not subjected to tests uniformly imposed upon non-party witnesses. For example, the rule admitting extrajudicial statements by parties precludes not only objections that they are hearsay, Fed.R.Evid. 801(d)(2); but also objections to form, *Bill v. Farm Bureau Life Ins. Co.,* 254 Iowa 1215, 119 N.W.2d 768 (1963) (lateral motion of head in answer to question "Is there any doubt in your mind that your son committed suicide?"), *Alires v. Southern Pacific Co.,* 93 Ariz. 97, 378 P.2d 913 (1963) (statement that railway crossing is particularly bad); objections based on a lack of personal knowledge, *Bill, supra, Scherffius v. Orr,* 442 S.W.2d 120, 124–25 (Mo.App.1969) (ownership of calf which caused highway accident); and objections that extrajudicial statements were wholly self-serving when made, *Frank R. Jelleff, Inc. v. Braden,* 233 F.2d 671 (D.C.Cir.1956) (admission of a complaint in an indemnity action to prove liability in primary tort action). *Baxter* simply embroiders on these well established legal fabrics and has no application to the City's use of resort to the privilege by the witnesses against Brink's.[3]

---

**3.** Heidt, *The Conjurer's Circle: The Fifth Amendment Privilege in Civil Cases,* 91 Yale L.J. 1062 (1982), argues generally that in civil cases in which corporations are defendants, an employee's assertion of the fifth amendment should be treated as a vicarious statement of the corporate employer. *Id.* at 1119–22. The comfort found by the majority in Professor Heidt's discussion of the admittance of assertions of the privilege by former employees is derived only by omitting his explanation of why such admittance is not "necessarily" barred. The full text of the pertinent paragraph reads:

> That the invoker is no longer the defendant's employee at the time of his invokings need not necessarily bar admitting the invokings as a vicarious admission. The fact of present employment serves primarily to reduce the chance that the employee will falsely claim to

have engaged in criminal conduct for which the defendant employer is liable. Any factors suggesting that a former employee retains some loyalty to his former employer—such as the fact that the employer is paying for his attorney—would serve the same purpose. *Id.* at 1120 n. 214. In the instant case, four of the former employees had been discharged by Brink's after their indictment and no showing of residual loyalty was made. The one continuing employee was made a third party defendant by Brink's, but we have previously held that

where an employer and employee stand in "conflicting litigating positions," statements of the employee may not be introduced as admissions against the employer. *SEC v. Geon Industries, Inc.,* 531 F.2d 39, 43 n. 3 (2d Cir.1976). Moreover, Professor Heidt's suggestion that assertions of the privilege by an employee are admissible against the employer is well taken only where the employer in fact can control the employee. Where collective agreements or other legal barriers to discharge exist, the logic of his position is undermined.